The jury found accordingly, 30*l.* damages, and six pence costs.

JOHN DUNBAR heir of WILLIAM DUNBAR *against* CONRAD JUMPER assignee of Rev. WILLIAM THOMSON.

A small variance in setting out a written instrument in the declaration will be fatal; but the rule does not hold, where the defendant by a trick withholds the instrument.

Grant of land necessary to a mill in fee, grantee yielding and paying to the grantor and the lawful heir of his body, the privilege of grinding certain grain in the mill, toll free, is a covenant running with the land, and the eldest son after the death of grantor, may support covenant thereon, against the assignee of the grantee with notice of the charge.

COVENANT. Pleas *non est factum* and covenants performed, with leave to give the special matters in evidence.

The suit was founded on articles of agreement between the said William Dunbar and William Thomson, bearing date January 23d, 1765, whereby Dunbar, in "consideration of the rents and covenants therein contained, sells to Thomson, his heirs and assigns, one half acre of land, they yielding and paying to Dunbar, and the lawful heirs of his body, the privilege of grinding such grain as may be used or consumed by Dunbar in his private family on the plantation which he now occupies, or the heir of his body on the said plantation after his decease, free of toll, as long as the mill shall be in order to grind; and if the mill shall overflow a greater quantity of ground, Dunbar obliged himself to convey to Thomson such further quantity, and thereby released him from all damages, on Thomson paying him for the land according to the judgment of two indifferent persons." A covenant of special warranty on the part of Dunbar was also contained therein. It was conceded, that the one half acre of land was indispensably necessary to the defendant's mill; the dam required it as an abuttal. Dunbar, the father, died in 1765, and by his will devised to his two sons, John (the now plaintiff, the eldest thereof) and Thomas, the lands adjoining to the mill, containing 370 acres, whereof he died seized. Thomson, after his death, and one John Holmes, a purchaser of the premises under him, freely permitted the widow of Dunbar, the privilege of grinding the family grain, toll free. The defendant who bought the mill and appurtenances in 1775, continued the like privilege to the plaintiff, but having obtained a conveyance of 87 acres and 36 perches, part of the lands devised to Thomas Dunbar, refused it after that period, in 1783. He also in 1779, got a deed from the said Thomas and his brother William, for a few perches of land, which recited the articles of 1765.

It appeared that both Holmes and the defendant had notice of the articles of agreement, before the times of their respective purchases, though Thomson's conveyance made no mention thereof.

In 1779, the defendant brought the articles to the recorder's office to be entered of record, and the word "used" (applied to the grain) being darkly expressed, therein, was inserted in the record "raised" by the misprision of the clerk. On the action being brought in the Common Pleas, oyer was demanded by the defendant, and the plaintiff offering to make oath that he had not the original agreement in his possession, and on the most careful inquiry could not discover where it was, the court on argument determined, that a copy of the record should be received as good oyer. The defendant at that time had both parts of the agreement in his hands, and now produced them in court, though he was positively charged with having before repeatedly denied it. He most probably had obtained one of the parts from the widow of old Dunbar, with whom it was proved the plaintiff had been on bad terms; and it was sworn by a witness, that he would not pay the consideration money of the 87 acres tract until he received the copy.

The plaintiff was entitled 223½ acres, part of his father's original tract of 370 acres, including the old mansion house. His declaration set forth the articles as recorded, and of course it contained the words "grain raised" instead of "used," &c.

A motion was make for a nonsuit, on the ground of this variance. It was said to be a very material one, and altered the whole contract. It was the plaintiff's fault to commence his suit before he had obtained the original written instrument. The defendant was not bound to furnish the plaintiff with materials, to enable him to draw his declaration. It is admitted by counsel in *Espin. Ni. Prius* Reports 51, that a variance between the instrument declared on and the original, though in the possession of the defendant, will nonsuit the plaintiff. If a recognizance be taken before a judge and not in court, and the plaintiff declares on a recognizance in court, it is a fatal variance. 2 Salk. 564, 659.

But the court refused the motion. The rule certainly is, that a trivial variation in setting out a contract or written instrument is fatal. 3 Term Rep. 643. 4 Term Rep. 560 Cowp. 177. 1 Stra. 201. 3 Salk. 660. But the application of the rule must, in reason, be confined to such cases, where either the plaintiff has the original in his possession or can by due exertions obtain it.

The action of trover brought for the bill of exchange in the case cited at the bar, was grounded on the bill's coming into the defendant's hands and his subsequent conversion; therefore, by giving due notice, the plaintiff might have procured it, or have been let into other evidence.

There was much unfairness in the defendant's conduct in the present instance. He prayed oyer as a measure necessary for his defence in the action. He denied having the articles in his custody. The plaintiff neither had the originals nor knew where to procure them. The Justices of the Commou Pleas under such circumstances, rightly held, that a copy furnished from the record was oyer, and the declaration pursued the record. The defendant himself brought the deed to the office to be recorded, and could not be surprised by the papers which he now produces. After this improper management, it does not lie in the mouth of the defendant, to insist on the variance, however fatal it might be in common cases. The court at the same time expressed their sentiments, that if the plaintiff on a full hearing should be entitled to a verdict, the jury should proportion the damages to the loss of the privileges as really contracted for the original agreement.

Three objections were then raised to the plaintiff's recovery : 1st, The presumption was, that the covenants in the agreement had been released. 2d, That the defendant was not bound thereby. 3d, That the plaintiff could not entitle himself to the suit.

On the first head it was said, that the defendant having in his hands both parts of the articles of agreement of 1765, it must be presumed that he came to the possession thereof fairly; and that the covenant of Thomson had been extinguished and released by the joint consent of the Dunbar family.

But to this it was answered, that his possession of the counterpart of the contract had been fully accounted for. The widow of Dunbar and the plaintiff had disagreed, and the defendant extorted the the family copy, by refusing to pay the consideration money of the 87 acres and 36 perches tract, until it was delivered up to him. He had continued the privilege of the plaintiff up to 1783, and if the later had agreed to release it, the same was readily capable of proof.

On the second ground, the defendant contended that this privilege could not be considered as a rent, because it did not issue out of the specific lands granted. The covenant is collate-

ral to the one-half acre transferred; it applies solely to the mill. The words " yielding and paying" must be reservations out of the thing granted.

When a covenant extends to a thing *in esse*, parcel of the demise, it shall go with the land and bind the assignee, though not mentioned: *aliter*, where it is collateral to the thing demised; for there the assignee is not bound, though expressly named. 5 Co. 16 *a. b.* 3 Wils. 27. This covenant would bind Thompson or his personal representatives, but cannot affect his assignees, though they had notice thereof. Though it might run with the half acre, it does not go with the mill, and from the mill the benefit is to issue.

Besides, it was uncertain whether the mill, with the addition of the half acre, could be carried into effect; and a grant of a mere possibility is void. 3 Com. Dig. 439. The deed of Thomson, on the face of it, did not charge the mill and lands with this privilege as an incumbrance.

The plaintiff's counsel insisted that the contract was completely reasonable, and was equally beneficial to Thomson and his assigns as to Dunbar. The scite of the mill could only be rendered productive, by obtaining this half acre to butt the dam on; it was a *sine qua non* to the mill itself; when a grant of it was procured, the former impossibility of erecting an useful mill was reduced to absolute certainty.

This privilege may in strictness be considered as a rent, issuing out of the mill and its appurtenances, and might be distrained for. A distress may be taken for any kind of rent in arrear. Co. Lit. 86, 116. 2 Bl. Com. 41. 3 Bl. Com. 6, 7. Rents and other profits out of land are inheritable, though they lie not in tenure. 2 Woodeson, 4, 5. Shares in the new river water are incorporeal herditaments. *Ib.* 59. Incorporeal, as well as corporeal hereditaments are, in general, at the same time, tenements. *Ib.* 60. If rent was reserved on land, and some incorporeal hereditament (as tithes) jointly, though the sum was much greater in respect to the tithes than the land, yet the whole was considered as issuing out of the latter, at least in respect to the remedy by distress. *Ib.* 67. Rent is reservable out of the vesture or herbage of land demised. Co. Lit. 47. There is no difference between lands and tithes, in the case of a rent against an assignee. 3 Wills. 32. A covenant by lessees, to grind all the corn, &c., which lessors should spend ground, relates to the premises, and running with the land, may bind the assignee. 1 Vez. 56. Equity will decree an assignee to pay

rent after he has assigned, if he has enjoyed the estate. 2 Vern. 421. And in the same book, 423, it is said by counsel, that though assignees may not be liable at law for an incorporeal inheritance, for want of privity of estate, yet equity would oblige them to answer the rent. If assignee of a lease assigns it over, equity will compel him to pay the rent which became due during his enjoyment, though the privity of estate was destroyed in law. 1 Equ. Cas. Ab. 47. Equity will extend relief against an assignee. 1 Fonbla. 350.

The present case in principle much resembles that in Prec. Cha. 39. There a water course was granted by baron and feme, through feme's lands, with covenants for them, their heirs and assigns, to cleanse and keep it in repair, and suffer a common recovery to establish the grant; and it was held not to be a personal covenant, but to run with the land, and to bind the assignees, being made good by the recovery.

The circumstance of the recital in the deed of 1779 of the articles of 1765, from Thomas and William Dunbar to the defendant, for one rood and sixteen perches of land, will moreover subject the defendant to this covenant. For a recital in a deed, transferring property, amounts to an agreement that the party is so entitled, as is stated in the recital. 1 Pow. on contracts, 23. A party cannot say anything against his recital. 1 Leon. 122. Covenant will lie on a recital. 2 Equ. Cas. Ab. 653. The rule is, that all covenants shall be construed according to their substantial meaning, and most strongly against the covenantor. 1 Espin. 270, 271.

On the last ground, it was said for the defendant, that if the plaintiff recovers, he must bring himself within the description of the agreement. He ought to occupy the whole, and not a part of his father's lands. It will not be urged, that if he has sold and conveyed the lands he now holds, he could personally be entitled to this privilege; so when the plaintiff's brothers conveyed to the defendant the tract of 87 acres, it must be supposed to have extinguished the covenant. The privilege was an entire thing; it could not be divided among all the children; nor was such a benefit in contemplation of the parties. There is no heir at law in Pennsylvania, where there are several children. All equally represent their father; no one can take in preference to the rest; and in this particular our policy varies from England.

If the words "lawful heir of his body," are merely descriptive of the person to take, then William Dunbar and the plaintiff his son would be joint tenants. But the terms of the contract

forbid this construction, because the privilege is expressly confined to the father, during his life. Neither can the words operate as terms of limitation. Rent reserved to one of his heirs, is good only during the life of the grantor, and is void as to the heir. 4 Bac. 349. 5 Com. Dig. 524. 5 Co. 112. Co. Lit. 214. a. Vent. 163. Lease for years, reserving rent to his heirs, or to commence after his death, the rent is incident to the reversion descending to the heir; *aliter* if the reservation had been made to his son, though he happens afterwards to be heir. 4 Bac. Ab. 347. Gilb. on Rents, 58.

Should it be urged that this is an estate tail, it will admit this answer, that such a right cannot be entailed, for the inheritance must necessarily issue out of lands, and not be merely personal, or arising out of chattels. Co. Lit. 20. a.

The words of the agreement are too vague and uncertain a foundation for the plaintiff's action.

The plaintiff's counsel answered that he was fully within the description of the article. He was the eldest son, and as such the heir at law of William Dunbar. He owned the most considerable part of the original tract, lived in the old house on the land, and had not transferred the same. The limitation of privilege to the plaintiff is not in the disjunctive but in the conjunctive. It is asserted, that such a privilege as the present may be entailed, and that there are apt words to effect it in the present instance. The word "heir" is necessary to create an estate tail. Co. Lit. 20. a. It is *nomen collectivum;* there can be but one heir at one time, and it shall go from heir to heir. Cro. El. 313, 314. An house and furniture are limited to a feme and such heir of her body as should be living at her death, and in default of such, remainder over; the feme has an estate tail in the house, and the absolute property in the furniture. 2 Vern. 324. Rents or other profits granted out of land may be entailed and barred by a common recovery; otherwise annuities. 2 Woodeson, 71, 72. Where the reservation of rent is general, it shall be carried to the person who would have succeeded to the estate, if no lease had been made; where it is particular (as to the lessor himself,) it shall determine by his death. 4 Bac. Ab. 349. A covenant real will descend to the heir, and running with the land, the heir at law may bring the action. 10 Mod. 158. The heir at law may be charged as assignee in covenant, which runs with the land. 4 Term Rep. 75. Such covenants as are annexed to the estate shall descend to the heir of covenantee, and he alone shall take advantage of them. 1 Bac. Ab. 533. 2 Com. Dig. 561.

The court informed the jury, there was nothing unreasonable or inequitable in the plaintiff's claim. The mill could not exist without the additional half acre of ground, and William Dunbar was entitled to an adequate compensation for his grant.

The defendant had purchased the mill and lands with full notice of the charge, and had performed the contract in all its parts until 1783, when he purchased a part of the lands devised to the plaintiff's brother Thomas. He now rests his defence on grounds merely legal.

The presumption contended to arise from both parts of the articles being in the defendant's possession, that the covenant had been released by the family, had been fully obviated by the evidence produced. Besides if this right was vested in the plaintiff, the other branches of the family could not defeat it.

The covenant on the part of William Thomson could not be considered as personal to himself and collateral to the lands. The half acre was appurtenant to the mill and indispensably necessary thereto. It was an essential part of the mill itself, and the mill was dependent thereon. Under the authorities cited, therefore, the covenant would run with the mill and appurtenances, and bind the assignee, though not named. Besides, one possessed of a mill, might charge the same with such a privilege for the benefit of another, as is now contended for. Thomson for himself, his heirs and assigns, impliedly covenants to yield and pay the benefit of grinding certain grain, toll free, for a good and adequate consideration. This is the substantial construction of the article, though there are no express words granting the charge.

The present plaintiff is entitled, it any one under old William Dunbar can be entitled to this emolument, after his death. To form a different construction would disappoint the clear declared intention of the parties. John Dunbar was the eldest son; and as such (technically speaking according to the English law) might well be denominated the heir at law. It is true, the terms are not equally applicable by the policy of our laws, as in Great Britain, in common cases. But even in Pennsylvania, lands entailed descend according to the course of the common law; and this has been the uniform idea for ninety years past, and has been so determined judicially. The eldest son claims not under the father, but through the father, in case of an entail, *per formam doni.* The description, which can suit no one but the plaintiff (after his father's death) agrees in other particulars. He lives in his father's mansion house, and is entitled to nearly two third parts of the tract whereof his father died seized.

The damages are the peculiar province of the jury. But it

would seem reasonable, under the words of the agreement, that there should not only be a reasonable allowance for the toll of the grain used in the family of the plaintiff, but also for that of his horses and other stock on the farm, at a moderate computation. Vid. 1 Vez. 56. On this point however, the court gave no decided opinion, but submitted it to the judgment of the jury.

Verdict *pro quer.* for 34*l.* 1*s.* 3*d.* damages, and six pence costs.

Messrs. Duncan and Watt, *pro quer.*

Messrs. Hamilton and C. Smith, *pro def.*

———————————————

Lessee of ROBERT LOWREY *against* JAMES GIBSON.

Vacating warrants have generally issued under special equitable circumstances which will be presumed after a length of possession, without positive evidence.

One having a warrant and not following it up with diligence, or taking possession, but silently permitting others to improve, shall be postponed.

Certificate of the surveyor general and receiver general not on oath, respecting the practice of the land office, no evidence.

EJECTMENT for 200 acres of land in Hopewell township, brought in the Common Pleas to October term 1781.

The plaintiff claimed under a survey of 200 acres made by Thomas Cookson, deputy surveyor, on the 11th September 1744, marked, " surveyed on a ticket, warrant to be made out, " and a subsequent warrant to the lessor of the plaintiff for 100 acres of land in Hopewell township, adjoining the land of John Finley, dated 18th February 1744-5. Both the survey and warrant were indorsed, " vacated and returned for the use of George Croghan."

The vacating warrant was dated 22d June 1749, in favor of the said George Croghan, and recited that " the conditions of the former warrant had not been complied with. " The defendant claimed under a patent issued on the day following to Croghan, in consideration of 31*l.*

It did not appear that any money had been paid by Lowrey, when he obtained his warrant, or that he had ever been in the actual possession of the lands in question.

On the contrary, it was sworn by one witness, that in 1779, he wished to buy the lands for the lessor of the plaintiff, and offered him 100*l.* for them, if he would make him a good title. He then inquired of Lowrey, whether he had not contracted with Croghan for the tract, to which the other replied in the affirmative, but that he had received from him only 6*l.* The land was then uncleared ; but now almost all of it was in cultivation.