*347 And now at this term, the judgtnent of the Court was delivered by — ■
Kennedy, J.
The plaintiff alleges that the rent in question is in its nature strictly a rent-charge, and that the defendant therefore, by releasing to Jonathan Smith a part of the ground upon which, according to his own phrase, it was charged, released the whole rent. It becomes material, therefore, to inquire and see whether it be a rent-charge or not; and if not, whether it is not a rent-service; because if it be a rent-service, the defence set up against the payment of it cannot avail, at most, beyond what shall be considered a proportional part, according to the value of the land released.
According to Littleton, there are three sorts of rent; which he specifies in section 213; namely, rent-service, rent-charge, and rentseck. “ A rent-service,” he says, “ is where the tenant holdeth his land of his lord by fealty and certain rent, or by homage fealty and certain rent, or by other services and certain rent. And if rent-service at any day, that ought to be paid, be behind, the lord may distrain for that of common right.” And in section 218, he also shows how a rent-charge and a rent-seck were created before the passage of the statute quia emptores terrarum, (18th Edw. 1, stat. 1, c. 1.) He there says, “if a man seised of certain land, grant by deed poll, or his indenture, a yearly rent, to be issuing out of the same land to another in fee, or fee tail, or for term of life, &c. with a clause of distress, áre. then this is a rent-charge; and if the grant be without clause of distress, then it is a rent-seck; and idem est quod redditus siccus, for that no distress is incident unto it.” And in the 217th section, he lays it down that “ if a man by deed indented at this day, (which was after the statute quia emptores had come into operation,) maketh a gift in fee tail, the remainder over in fee; or a lease for life, the remainder over in fee, or a feoffment in fee; and by the same indenture, he reserveth to him and to his heirs a certain rent, and that if the rent be behind, it shall be lawful for him and his heirs to distrain, &c., such a rent is a rent-charge ; because such lands or tenements are charged with such distress by foree of the writing only, and not of common right.” But before the passage of the statute quia emptores, it was clearly otherwise; for in the216th section, he says, “ before that statute, if a man had ¿nade a feoffment in . fee simple by deed or without deed, yielding to him and to his heirs a certain rent, this was a rent-service, and for this he might have distrained of common right; and if there were no reservation of any rent, nor of any service, yet the feoffee held of the feoffor by the same service as the feoffor did hold over of his ‘lord next paramount.” Hence it is evident that the ground-rent in question cannot be considered a rent-charge, unless it be so by the force of the statute quia emptores; but if it shall appear, upon examination, that this statute is not and never has been in force in Pennsylvania, then it would *348 seem to be equally evident, that it must be held to be a rent-service. King Charles the 2nd, in granting the province of Pennsylvania to William Penn and his heirs, gave it to be held in free and common soccage, and by fealty only, for all services ; (see section 3d of the charter.) And by the 17th section thereof, William Penn, his heirs . and assigns had full and absolute power given to,them, at all times thereafter, and forever, to assign, alien, grant, demise or enfeoff such parts and parcels thereof, to such persons as might be willing to purchase the same, their heirs and assigns, in fee pimple, fee tail, for term of life, lives, or years, to be held of the said William Penn, his heirs and assigns, as of the seigniory of Windscn\ by such services, customs and rents as should seem fit, to the said William Penn, his heirs and assigns, and not immediately of the said King Charles, his heirs or successors. And again by the 18th section, it was further provided, that the purchasers from William Eenn, his heirs or assigns, should hold such estates as might be granted to them, either in fee simple, fee tail, or otherwise, as to the said ¡William Penn, his heirs or assigns should seem expedient, the statute of quia emptores terrarum in anywise notwithstanding. From these provisions, it appears most clearly, that it was the intention of King Charles, to grant the lands of the province to William Penn, his heirs and assigns, so as to enable them to hold and dispose of; the same as if the statute quia emptores had not been in existence. ' That it has been ever so understood, may be seen and fairly inferred from both our legislative and judicial proceedings. |
By the 14th section of the laws agreed on between William Penn and the freemen and planters of the province, in England, May 5th, 1682, in the year following the date of the charter to him, it was declared that all lands and goods should be liable to pay the debts of the owners, except when there was legal issue, and then, though all the goods, only one-third of the land. (See App. to Hall & Sellers, vol. Pro. L. page 4.) And on the 7th of December in the same year, by an act of the assembly of the province held at Chester, Ibid. 7, one-half of the land was made liable, in case of no issue, to the payment of debts, where it was bought before the debts were" contracted. By a subsequent aet passed the 10th of March, 1683, at Philadelphia, (Ibid. 9,) one-third of all the estate of the owner upon his death, including both real and personal, was directed to be given to his wife, another third thereof to his children equally, and the remaining third as he had directed; but in case his wife had died before him, then two-thirds to be given to his children, and the other third as he had seen fit, after payment of his debts. Also by another act passed at the same session, (Ibid.) it was enacted that one-half of the estate of a deceased intestate, without kindred, should go the governor, and the other half to the public: this latter half by an act passed afterwards, in 1684, (Ibid. 10,) was given to the public stock of the county. Again, by an act of the 1st of June, *349 1693, {Ibid. 13,) the administrators of an estate were authorised to sell the real as well as the personal estate of their intestate, for the purpose of paying his debts; and after paying them were directed to pay the surplus, where their intestate died without kindred, one-half thereof to the governor, and the other to the county stock. Here we see that among the first regulations agreed on and adopted in England, with a view to the future settlement of the province, the right of escheat, in favour of creditors, was clearly taken away. And shortly afterwards, the surplus, if any, after payment of the debts of the intestate dying without kindred, was given to the governor of the province and the public in equal parts. The half allotted to the public, was subsequently given to the county; thus making a disposition of his estate that had no relation or connection whatever with the tenure by which he held it; so that the right of escheat can scarcely be said to have been introduced into the province before the year 1700. Then an act of the assembly for ascertaining the descent of lands, and better disposition of the estates of persons dying intestate, was passed. {Ibid. 16.) This act, after making all the lands as well as the personal estate of the intestate, liable to be seized and sold by his administrators for the payment of his debts, directed, by the second section thereof, that in case he should leave no known kindred, then all his lands, tenements and hereditaments should descend and go to the immediate landlord, of whom such lands were held, his heirs and assigns; and if held immediately of the proprietary, then to the proprietary, his heirs and assigns ; and all the goods, chattels, and personal estate to the proprietary and governor, his heirs and assigns. Now, here we have the right of escheat established upon and regulated according to the right of subinfeudation, and the principle of tenure between the last feoffee or ter-tenant and his immediate feoffor or vendor. The same provision in regard to the right of escheat was introduced into a new intestate law passed in 1705, (Hall & Sellers, vol. Pro. L. 35,) which continued in force till after the revolution. This regulation of the right of escheat was in direct contravention to the statute quia emptores ; which was enaeted expressly for the purpose of securing it to the lord paramount, instead of the immediate landlord or feoffor or vendor, in every case of the ter-tenant’s dying without heirs; together with the right of marriage and of wardship, which were also claimed as the fruits of the feudal system. The two last of these rights however, were taken away by 12 Car. 2, c. 34, some six years before the granting of the province to William Penn ; so that the door seems to have been completely closed from the first in the province, against the introduction of the only remaining right that existed under the authority of the statute quia emptores terrarum. As to judicial evidence of the non-existence of this statute here, I refer first to the case of Dunbar heir of Dunbar v. Jumper assignee of Thompson, (2 Yeates, 74,) where upon a mutual *350 deed, executed by the vendor and the vendee, by which the vendor sold and conveyed an acre of land to the vendee in fee, it being necessary for a grist mill of the vendee, in consideration of the vendee’s yielding and paying to the vendor and the lawful heir of his body, the privilege of grinding such grain as might be used or consumed by the vendor in his private family, on the plantation which he then occupied, or the heir- of his body, on the said plantation after his decease, free of toll, as long as the mill should be in order to grind, it was held by Shippen and Yeates, Justices, at Nisi Prius, at Carlisle in 1796, that an action of covenant was maintainable by the heir at law of the vendor against Jumper the assignee of Thompson the vendee, for refusing to grind grain toll free for the plaintiff, 'according to the terms of the deed. Now under the statute quia emptores, if it had been in force here when this case was decided, and our lands considered as held under feudal tenures, the grinding of the grain ought to have been regarded as a rent-charge, and perhaps more properly so, than a ground-rent reserved on a deed poll. But a covenant to pay a rent-charge is merely personal and collateral to. the land, and therefore will not render the assignee liable to an action of covenant for the non-performance of it. Brewster v. Kitchen, Kitchell, or Kidgell, (1 Ld. Raymond, 322, S. C. Holt, 175. 5 Mod. 374. 1 Salk. 198. 12 Mod. 170-1.) Cook v. Earl of Arundel, (Hardr. 87.) Platt on Co. 65,475. Hence we may very fairly conclude, that the Court in Dunbar and Jumper did not consider the statute of quia emptores in force here, otherwise they would not have held, as they did, that the covenant of the vendee to grind toll free ran with the land, and that the assignee or terretenant thereof became liable to an action of covenant for not fulfilling it. So in the case of Bantleon v. Smith, (2 Binn. 146,) this Court, where the rent in question was a ground-rent, like the present, appear to have taken a material distinction between it and that which is strictly and technically so called, and to have excluded all operation of the statute quia emptores from a ground-rent, by which alone, it can be converted into a rent-charge. And although the late Chief Justice, who delivered the opinion of the Court, there ■calls it a rent-charge, as it had been frequently before and since, by Judges of this state without intending to pronounce it strictly a rent-charge, yet he is particular in the course of his opinion, to distinguish it from a rent-charge, and upon the distinction so taken, the opinion of the Court seems to be founded. He says, page 152, “ upon examining these cases, and those cited on the same subject by the plaintiff’s counsel, (meaning English cases cited by the counsel on both sides in course of their arguments,) it will appear that the rent-charge there spoken of, was not of the nature of the rent then in question. It was the case of a man who granted to another and his heirs, a yearly sum of money, and charged it on his land, ¡with power'.to the grantee to distrain.” This doubtless was the only *351 mode known to the English law anterior to the statute quia emptores, by which a rent-charge could be created; and by that statute a fee farm-rent in England, which prior thereto, was substantially the same with our ground-rent, was converted into a rent-charge, if accompanied by a clause of distress, by considering the words “ reserving to- the feoffor, &c. a rent of, &c.,” the words of the feoffee, and as amounting to a grant by him of the rent to the feoffor, 6 Bac. Abr. page 6, tit. sub-division, Rent-charge, instead of holding them to be as in truth they were, the words of the feoffor; and as they had previously at least ever been so considered. 1 Inst. 143, b^_ And this seemingly forced construction of making the words in fact of the feoffor, to be the words in law of the feoffee, would appear to be necessary in order to comprehend how it is that a fee-farm rent in England is converted into a rent-charge by the operation of the statute. But what proves most incontestably that the Judges, who decided the case of Bantleon and Smith, did not consider the statute quia emptores in force here, is, their report of the English statutes in force, excluding it, which was made in the year preceding, (1808,) in obedience to a resolution of the Legislature requiring them to report all the English statutes then in force in the state. As further evidence of the judicial course, going to prove that this statute has not been considered in force here, actions of covenant have been brought and maintained for the recovery of ground-rents reserved in fee and for life, upon lands granted in fee, when in arrear, by the assignees thereof, in some instances against the grantees of the lots, who first covenanted to pay them, and in others against their assignees. See Philips v. Clarkson, (3 Yeates, 124.) Streaper v. Fisher, (1 Rawle, 155.) Herbaugh v. Zentmyer, (2 Rawle, 159.) Royer v. Ake, (3 Penn. Rep. 461.) Miles v. St. Mary’s Church, (ante, 229.) But if the statute had been in force here, the ground-rent, recovered in these cases, would by means thereof, have been converted into a mere rent-charge ; and then, as has been already shown, the covenant on the part of the grantee of the land to pay the rent would have been simply personal, and collateral to the land; upon which no action could have been sustained against the assignee of the grantee thereof. ~
Having now shown that the feudal rights of marriage and wardship, to secure the enjoyment of which, together with that of escheat to the chief lords, was the only inducement for passing the statute quia emptores, were taken away by the statute of 12 Car. 2, c. 34, a few years before the grant of the province to William Penn; and that the right of escheat here was established in the earliest settlement of the Province upon a totally different principle, recognizing distinctly the right of subinfeudation; that the decisions of our Courts have been at variance with its operation; and not being aware of even the shadow of evidence tending to show the contrary, *352 I atn inevitably brought to the conclusion, that it never had any existence here.
This statute then being out of the way, we have seen that according to the principles of the common law, (Littleton, sec. 216,) the rent in question is clearly a rent-service. And lord Coke, in his commentary upon this section, (Co. Lit. 143, a,) adds “ at the common law, if a man had made a feoffment in fee by parol, he might upon that feoffment have reserved a rent to him and his heirs, because it was a rent-service and a tenure thereby created.” It was called a rent-service, because it was a compensation for the services to which the land was originally liable; 3 Cruise Dig. tit. 28, Rents, c. 1, sec. 6. And at this day, the tenant (says Chief Baron Gilbert,) does the corporal service of fealty; Gilb. on Rents, 9: and therefore it is still called a rent-service, because it hath always some corporal service incident to it, which at the least is fealty. Gilb. on. Distress, 5. 1 Inst. 142, a.
The rent in question then being a rent-service and not a rent-charge, the doctrine contended for, as well as the authorities cited by the plaintiff’s counsel on the argument, showing what in law will amount to an extinguishment of the whole rent, where it is a rent-charge, and that it is not in its nature apportionable by the act of the parties, will be found to be wholly inapplicable to a rent-service. A rent-charge was considered repugnant to the principles of the feudal policy, inasmuch as it created an incumbrance upon the land of the tenant, and rendered him the less able to perform the services incident to his tenure; and being looked on as against common right, the law did not attach the remedy by distress for its recovery when in arrear, so that it is only given by virtue of the clause to that effect in the deed creating it. Gilb. on Rents, 155. Littleton, sec. 217. 3 Cruise Dig. tit. 28, Rents, ch. 1, sec. 9. In short it was regarded with disfavour by the law, and any act therefore on the part of the owner of it, which could in any way be construed to be incompatible with the future assertion of right to the same, was held to amount to a release or an extinguishment of it, without regard to the intention: as for instance, if he purchased or released a part of the land from the rent, upon which it was charged; this was held to be an entire extinguishment of his right to the whole rent; Littleton, sec. 222; 1 Inst. 147, (b); Gilb. on Rents, 152; 18 Vin. Abr. 504; Bro. tit. Apportionment, pi. 17; 3 Cruise Dig. tit. 28, Rents, ch. 3, sec. 13, 16. But a rent-service being given as a compensation for the services to which the land was originally liable under the feudal system; (3 Cruise Dig. tit. 28,ch. 1, sec. 6;) must therefore be judged of by the rules which regulated the performance of those services. ~ Accordingly Littleton lays it down expressly in section 222, “ if a man which hath a rent-service, purchase parcel of the land out of which the rent is issuing, this shall not extinguish all, but for parcel: for a rent-service in such case, *353 may be apportioned according to the value of the land.” If the rent, however, in such case should be indivisible, as if it consist of a horse, hawk, &c. it would be taken away; Bruerton’s case, (6 Co. 1, b.) Co. Litt. 149, a; 8 Co. 155, a; Mo. 203; Gilb. on Rents, 151, 165. So if the lord purchase a part of the tenancy in fee, a'proportional part only of the rent becomes extinct, and the residue will continue” in esse, because of the enjoyment of the remaining part of the land by the tenant, which is the consideration for the payment of the rent. Ascough’s case, (9 Co. 135; Co. Litt. 148,6.) Lord Blade, Chiefs Justice, in Hodgkins v. Robson, (1 Ventr. 276,) may possibly be thought to go still further, when he lays.it down that if a lessee assign part of the land which he holds on lease, to a stranger without reserving any rent, and the stranger assigns it to the lessor, there shall be no apportionment or suspension of any part of the rent, because the'tenant, by assigning part, made himself answerable for the whole rent; and the lessor claiming under a stranger, is entitled to the benefit of his contract. This proposition is also repeated with seeming approbation, by Lord Chief Justice Baron Gilbert, in his treatise on Rents, 181. The reason of the difference mentioned between rent-charge and rent-service, is stated by Lord Chief Baron Gilbert to be this: In case of rent-service, the tenant is under the obligation of the oath of fealty, to bear faith to his lord, and to perform the services for the land which he holds of him ; and this obligation has its force, while the tenure of the lord continues; and the tenure could not be discharged by purchase of fart of the tenancy; for that construction would not only be attended with this absurdity, that the part, remaining in the tenant’s hands, would be held of nobody, and in consequence would produce this public inconveniency, that the remainder of the tenancy would be free of all feudal duties; which in the height of the feudal tenures, must have been a detriment to the public : wherefore, since for this reason, the tenure between the lord and the tenant, continued for so much of the land as remained unpurchased, the tenant, by his oath of fealty, was obliged to perform the services of it. But as it would have been unreasonable to have compelled him to perform the whole services that were reserved upon the old donation, when the lord had wilfully resumed part of the land, which was the consideration upon which the obligation to make the annual return of services was founded, the medium between the two extremes was adopted ; that as the enjoyment of the land was the consideration for the services, the return ought always to be made according to the proportion of the land, which the tenant continued in the possession and enjoyment of. But in the case of a rent-charge, when" the grantee purchases parcel of the land, the whole rent is extinguished, because there is no feudal deyendency between the grantor and the grantee by the deed of grant, which created the rent-charge, as there was by the feudal donation which created the rent-service. *354 And therefore as these grants were of no benefit to the public, and afforded no addition of strength or protection to the-kingdom, the law carries them into execution, only so far as the rent could take effect, according to the original intention of it; and therefore if the grantee had wilfully, by his own act prevented the operation of the grant according to the original intention of it, the whole grant was to determine. And as a rent-charge issues out of every part of the land, and consequently every part of the land is subject to a distress for the whole rent, therefore when the grantee purchases part of the land, it is become impossible by his own act, that the grant should operate in that manner, because it is absurd, that the grantee should distrain his own lands, or bring an assize against himself. Gilbert on Rents, 152-3-4. 3 Cruise Dig. tit. 28, Rents, ch. 3, sec. 14.
But rent-service being something given by way of retribution, to the landlord, for the land demised by him to the tenant; and the obligation of the latter to pay the rent arising from his having ea-joyed the land under a contract with his' landlord, it is reasonable that the extent of his obligation to pay should be regulated by the extent of his enjoyment; and therefore it is that if he be legally deprived of the enjoyment of part of the land demised, he shall be released from the rent only in proportion to the value of the land evicted. And in no case will an eviction of part of the demised premises, where the tenant continues to enjoy the residue thereof, discharge him from the payment of the whole rent, unless it be by the tortious act of the landlord himself, who shall forfeit all right to receive it in such case, as long as he prevents the tenant against his will, from occupying and enjoying any part of the land. Gilb. on Rents, 147. 10 Co. 128, a. 1 Roll. Abr. 235. Dyer, 56. Co. Lilt. 148, b. 1 Ventr. 277. Gilb. on Rents, 178-9.
Now let us see what the case of the plaintiff is, and how far -these principles are applicable to it. Mr. Ingersoll, the plaintiff being the tenant of a certain quantity of ground, subject to the payment of a rent-service or ground-rent, on the 30th of April, 1819, conveyed a part thereof in fee to Mr. Smith, in consideration of $2500 paid to him: thus making a division of the ground by an act of his own; and on the day following, Mr. Sergeant, who was then invested with the legal.title to the ground-rent, by his deed, in consideration of one dollar, released that part of the ground conveyed by the plaintiff to Mr. Smith, from the rent. This being the state of the case, I would ask, how can the release produce any other or greater effect towards extinguishing the rent, than if Mr. Sergeant had purchased the ground himself of the plaintiff, that Mr. Smith "bought: or had afterwards, instead of releasing to Mr. Smith, purchased the ground of him ? I cannot conceive now it is possible that it should, because the one would have been as much the wilful act of Mr. Sergeant as the other; and would have produced a union of the right to the rent, and of the right to that portion of the ground, *355 which would be at least as effectual for the purpose of producing an extinguishment of the rent, as a release confined in its terms to the same part of the whole ground could be. But we have seen that such a purchase would only have extinguished so much of the rent as would be equal to the value of that part of the ground so purchased: which proves that the release in this case ought only at most to be considered an extinguishment of so much of the rent as shall be equal in value to the ground released from it. In principle it can make no difference, whether the rent and a part of the land, out of which it issues, become united in the landlord himself, by his purchasing such part of the land, or in the owner of such part of the land by the landlord’s releasing it from the rent; the result and the effect would seem to be the same. The reasoning of the lord Chief Baron Gilbert on this subject, going to show that there ought to be an apportionment of the rent, is not only satisfactory but conclusive, as it appears to me when he says, “ there is no colour or reason why the whole rent should be suspended, when the lord .or lessor takes a lease of part of the land; because here is the concurrence of the tenant, who, by his own act and consent, parts with so much of the land as is re-demised, and thereby supercedes the former contract, as to such part. But since.the obligation to pay the rent, was, by the first contract, founded upon the consideration of the tenant’s enjoying the land, that obligation must still continue on the tenant, so far as it is not cancelled or revoked by any subsequent contract between the parties; and consequently the whole rent shall not be extinguished by such re-demise, but the tenant shall pay rent in proportion to the land he enjoys: because the obligation of the first contract must subsist so far as the tenant enjoys the consideration which first engaged him in such obligation.” Gilb. on Rents, 170-180. And although Mr. Ingersoll, the plaintiff, made no contract personally with Mr. Sergeant for the release, yet he had previously .made a contract by which he disposed of that part of the land released from the rent, to Mr. Smith, who thereby became the assignee of Mr. Ingersoll, invested with his rights pro tanto; and the contract made by Mr. Sergeant with Mr. .Smith in regard to it, may be deemed in effect, the same as if made by and with the express consent and approbation of Mr. Ingersoll himself, who'by his deed to Mr. Smith, must be considered as having authorised it. And had Mr. Ingersoll sold and conveyed to Mr. Smith his portion of the ground in fee expressly clear of the ground-rent, then according to the opinion of Lord Chief Justice Hale, already cited from 1 Ventr. 276, which I take to be sound law, Mr. Ingersoll would still have been liable to be distrained on for the whole rent, notwithstanding the release. And indeed it has been argued by the counsel for the defendant, that the recital in the deed of conveyance from the prin-„ tiff to Mr. Smith, contains a covenant on his part, that Mr. Smith! and those claiming under him, should hold the ground thereby con *356 veyed, discharged from the ground-rent; or at least, that he is es-topped by this recital from denying that such is the legal effect of nis conveyance, to Mr. Smith. Without undertaking to examine and reconcile all the judicial authorities in regard to the effect of recitals in deeds, a task possibly not easy to be performed, it will be sufficient to extract the principle, which seems to be established by the authorities cited by the counsel for the defendant. They, as it appears to me, only go to show that a party who recites a particular fact or agreement in his deed, will not be permitted after-wards to deny its existence: but if the recital be general, or contain, as it is said, a generality merely, he will not be estopped by it. What then is the nature of the recital in the present case? It seems rather to be a part of the description of the ground intended to be conveyed: or an explanation of it, with a view to fix more particularly its location and connection with what had been done before. The words of it are, “ being part of a larger lot or piece of ground, which Joseph Reed of, &c. by indenture bearing date the 9th day of October, 1818, granted and conveyed unto the said Charles J. Ingersoll, in fee, clear of all liens and incumbrances whatsoever.” In it two distinct facts may be said to be affirmed. First, the existence of the indenture mentioned; second, that the ground then about to be conveyed, was a part of the ground conveyed by the indenture. Either of these facts perhaps, according to the authorities cited, the plaintiff would not be at liberty to deny; but it is perfectly manifest, that the second is the only one that could have been considered at all material; because as to the existence of the indenture,.it was present, or if not, was on record, open alike to the inspection of both parties, proving its own existence. But the fact of the ground, then' about to be conveyed to Mr. Smith, being part of the ground conveyed by the indenture to the plaintiff, might not appear satisfactorily, by merely comparing the description of the ground given in the deed, which the plaintiff was then about to make, with the description of the ground in the indenture, conveying it to him without such assertion of the fact. Whether the indenture, mentioned in the recital, conveyed the ground to the plaintiff “ clear of all liens and incumbrances whatsoever,” was not so much a matter of fact as a question of law to be determined by a proper construction of the indenture, which, as it was upon record, Mr. Smith had the same opportunity of being correctly informed in regard thereto, that the plaintiff had, and must be presumed to have decided for himself. Caveat emptor is the maxim in such case. If it had been the intention of the parties, that the plaintiff should have conveyed to Mr. Smith, clear of all liens and incumbrances, nothing could have been more easy, than to have inserted in the deed, a formal and express declaration or covenant to that effect; which certainly ought to be done in all cases, when so intended by the parties. To say that the recital shows that such was their *357 intention, seems not to comport well with other parts of the deed. For the express covenant of special warranty given in it by the plaintiff is certainly powerful, if not conclusive evidence to show, in the absence of any other express covenant on his part, that it was not the design that he should be bound to do any thing beyond what was fairly embraced within it; or be restrained from doing any thing that was not inconsistent with it. Besides such recital as in the present case, is generally the work of the scrivener, made from the muniments of title, placed in his hands for drawing the deed, without any direction whatever from either of the parties to introduce it; and it would therefore seem unreasonable to give it the effect of a covenant not intended by the parties. But the truth of the recital in question, appears to me to be sustained by what would be the common understanding of the deed of conveyance from Mr. Reed to Mr. Ingersoll. Though from the face of it, it is plain that the ground was incumbered with the ground-rent when conveyed, yet as the habendum, to which it properly belongs to declare the nature and extent of the estate intended to be conveyed, gives the ground to Mr. Ingersoll, his heirs and assigns,.“ free and discharged from the aforesaid rent-charge, liens and incumbrances whatsoever,” it would generally be pronounced a deed conveying the ground “ clear of all liens and incumbrances whatsoever.” And this doubtless was the understanding of the parties at the time of its execution; and, if so, ought most certainly to be so construed.
But it has been alleged also on the part of the plaintiff, that Mr. Reed was the* owner of both the ground and the rent, and that this union of ownership produced an extinguishment of the rent. This _ conclusion would be correct if the fact was only so; but he never ~ was invested with the legal title to the rent. And although he was the equitable owner of it, by having bought and paid for it, yet that wjas after he had sold and conveyed the ground to the plaintiff, so that had he taken the legal title for the rent to himself in his own name, instead of having it conveyed to Mr. Sergeant, the extinguish^ ment of the rent could not have been produced by the mere unity of the two estates in the same person. Again, it has been said that ~ Mr. Reed, though not the owner of the ground at the time he became the equitable owner of the rent, yet he was bound by his covenant with the plaintiff to extinguish it, and therefore the plaintiff ought, in equity at least, to have the benefit of the purchase of the rent, and to have it considered as extinguished. But this would be to set aside the purchase and the right of Mrs. Sergeant the defendant contrary to a well settled rule of law, that a bona fide purchaser for a valuable consideration of the legal estate from a trustee with- ^ out notice of the equitable right or claim shall be protected. This rule is founded in equity as well as law, because Mrs. Sergeant or „ her agent, when about to make the purchase of the ground-rent from Mr. Sergeant, seeing that he was invested with the legal title to it, *358 was not bound to look or to inquire further, and even if she had been disposed to do so, she had no means of ascertaining Mr. Reed’s ^interest or concern in it; and having under these circumstances paid a full price for it, her equity to have the benefit of th.e purchase was at least as strong as that of the plaintiff, and having got the legal title added to her equity, she is clearly entitled to a preference.
It has also been contended, that the extension of the time for redeeming the ground from the charge of the rent was an extinguishment of it. I am unable to perceive how, or upon what principle this can be so. Even as between the plaintiff and Mr. Reed this act would not seem to have been at that time inconsistent with the letter of the covenant, at least on the part of the latter, whatever may be thought of its spirit. The covenant was only to extinguish the rent within the time then allowed, or such further time as might be obtained for that purpose, and in the mean time to keep the plaintiff harmless and indemnified from the rent; thus evidently contemplating the procurement of such extension of the time for extinguishing the rent, if it should be practicable, and desired by Mr. Reed. But suppose it had been otherwise, how is it possible that it could affect Mrs. Sergeant’s title to the rent ? She was a stranger not only to the dealings between the plaintiff and Mr. Reed, but was without any knowledge whatever of the claim or interest that the latter had in the rent, or of his obligation to the former, and took the rent after having paid a fair price for it, without the least apparent infirmity about it; and appears to have quite as good a title to so much of the rent as upon a proper apportionment thereof shall be found to be equal to the value of the ground retained by the plaintiff, as he has to the ground itself.
On the part of the plaintiff, this case has also been compared to that of a debt owing by two partners in trade, or two joint, or joint and several obligors, where a release given to one by the creditor, will for ever discharge both. The law as to these cases is certainly so, (Co. Lit. 132, a.;) but this is on the ground of their joint liability •being taken away or destroyed by the release of the creditor, that the other is released, as well as the one to whom the release is executed ; because if he were to be held liable at all after the release, it could only be severally, which would be permitting the creditor without his consent, to change the nature of his liability from that of a joint, or joint and several liability, into a several liability alone: in short, to vary and change the terms of the contract. But in regard to those who are severally and not jointly liable for the payment of the same debt, it is obvious this cannot be the effect of a release made in favour of one of them alone; for never having been liable otherwise than severally, the party not embraced in the release, cannot be said to have the nature of his liability changed in the least by it; and therefore it is, that a release of one of two several obligors or covenantors, will not release the other; see Mathewson’s case, (5 Co. *359 23, Cro. Eliz. 408, 546.) And so the liability or obligation of Mr. Ingersoll and Mr. Smith to pay the rent, whatever it was, being clearly several and not joint, the release could not change the nature of Mr. Ingersoll’s liability, nor increase the extent of it. But if it should be thought that the analogy is rendered more close to the case of joint debtors by considering the land as the debtor in this case; it is sufficient to observe that it is in its nature divisible, and susceptible of being .made liable separately according to the value of its respective parts, when divided by the act of the parties; and as Mr. Ingersoll was.the first himself to divide it, he has no just cause to complain or to object now, that his act in this behalf was assented to by the party invested with the legal title to the ground-rent at the time.
The case of one of several vendees, of distinct and separate parts of a lot of land, subject at the time of the sale thereof, to the payment of a mortgage, having his part released from the mortgage'debt by the mortgagee, has been presented by the counsel for the plaintiff as analogous ; and it has been argued that the act of assembly, of the 22d of April, 1822, entitled “A supplement to an Act, entitled ‘ An Act for taking land in execution for the payment of debts,’ ” shows that anterior to the passage of it, such release would have been a release of the whole debt. In this particular, however, this act is only declaratory of what the law was before, and was so considered by this court in Kulb v. Fisher, (1 Watts, 494.) See also Hicks v. Bingham, (12 Mass. Reps. 300.) Crawford v. Crawford, (2 Watts, 339.) But in addition to this, the cases do not appear to be alike. A debt secured by a mortgage is a mere chose in action, entire in its nature, founded upon a past consideration; whereas the ground-rent here is an inheritable estate that is divisible in its nature; and the rent falling due annually, may be said to be the fruit of it, which becomes payable only in consideration of the enjoyment of the land, which is also divisible in its nature, under the original demise or conveyance thereof, reserving the rent. It is true however as Lord Chancellor Baron Gilbert, says, Gilb. on Rents, 172, that formerly it was doubted whether a rent service incident to the reversion could be apportioned by a grant of part of the reversion, ánd whether the whole rent would not in such case become extinct; as the reversion and rent incident thereto were entire in their creation, it seemed to be thought bard by some that they should be divided by the act of the landlord, and the tenant thereby be made liable to several actions and distresses for the recovery of the rent. The case however, before us, can scarcely be said to be liable to this objection, because the first division was by the act of the tenant, in selling and conveying to Mr. Smith a part of the ground. But still this doubt did not remain long, because as the Chief Baron says, it “ was too narrow and absurd to govern men’s property long; for if I make a lease of three acres, reserving three shillings rent, as I may *360 dispose of the whole reversion, so may I also of any part of it, since it is a thing in its nature severable ; and the rent as incident to the reversion, may be divided too, because that being made in retribution for the land, ought, from the nature of it, to be paid to those who are to have the land on the expiration of the lease;” this reasoning is strikingly forcible to prove, that where the whole of the ground-rent in fee is still owned by one person, but the land upon which it was reserved has been divided and conveyed away by the tenant in several parcels, to as many different persons, the Tent may, as it becomes payable, be apportioned among them, according to the value of their respective portions of the whole land, and they be thus compelled to pay it. To this course, there does not appear to be even the shadow of an objection. For in the case of’a rent incident to a reversion, where the reversion .has been divided and sold in separate parcels to different vendees, who claim to have the rent paid to them in a corresponding ratio, with their respective portions of the reversion, each is entitled to sue or to distrain for his portion, if not paid ; and it is said that the tenant receives no prejudice thereby, and has no just cause of complaint, “ because it is in his power, and it is his duty, to prevent the several suits and distresses, by a punctual payment of the rent,” Gilbert on Rents, 173 ; 3 Kent’s Com. 375, 6. (First ed.) And yet there is certainly much more colour for complaint-on the part of the tenant in this last case, than in the case before us, or the one previously mentioned. It may be further observed that, ground-rents are a species of inheritable estates, that has increased greatly of late, within the city and county of Philadelphia, as also in some other parts of the state, and that the public have an interest in placing them on the same footing, as nearly as practicable with other estates, so as to make them answer the common exigencies of their respective owners. Unless then they can be apportioned, it is evident that they must fall very short of being made the means of supplying the necessaries and comforts of mankind. It may become necessary for the owner of a ground-rent estate, to divide it among his children, or to sell a part of it, to answer the exigencies of his family; but if he cannot sell and release a part of it to an owner of part of the ground upon which it was originally reserved, without extinguishing the whole rent, it is apparent that the value of both estates must be diminished, because it will- prevent the one from ever buying of the other in such case, though otherwise'it might be his interest to give more for the purchase than anybody else would do. Such a restriction is not to be tolerated where the policy of the law is to afford every possible, facility to the change of ownership in property, according to the will of the holders thereof.
I have now presented my views in regard to the questions involved in this case; and the reasons which have determined me in coming to the decision adopted by the court, to wit, that the release is only an extinguishment of so much of the rent as may be equal to *361 the comparative value of the ground bought by Mr. Smith of the plaintiff, at the time of the sale thereof; and that the defendant is entitled to recover the residue of the rent dué at the time of the distress. This apportionment however, can only be made by a jury, Hodgkins v. Robson, (1 Ventr. 276, S. C. Pollex. 141.) Fish v. Campion, (1 Roll. Abr. 237,) and as the verdict found by the jury does, not provide for it, the matter will have to be submitted to another jury, unless the parties will agree to take the price mentioned in the deed from Mr. Reed to Mr. Ingersoll, as the value of the whole of the ground subject to the ground-rent, at the time the release was given, and the price mentioned in the deed from Mr. Ingersoll to Mr. Smith, as the value of the part released from the rent. If this be agreed to, the whole case can be settled now; otherwise the verdict must be set aside, and a
Venire de novo awarded.
Sergeant, J. took no part in the decision of this cause, being related to the defendant.