## NAGLEE *v.* INGERSOLL. (*a*)

The grantee of land in fee, out of which a rent is reserved, in the nature of a rent service, by an indenture, is estopped denying title in the grantor to whom the rent was reserved. And if the grantee enter upon the whole of the lot conveyed, he is liable for the rent, though the grantor fail in showing title as set out in his declaration.

An attorney at law cannot by agreement bind his client's title to land, so as to work a conversion.

Nor will an agreement to refer a question of title, and accept a pecuniary compensation for an unlawful encroachment, the extent of which is to be determined by the referees, work a conversion, until an award is made. Hence, such an agreement would be no defence to an action for rent reserved under a subsequent conveyance.

Tenant for life, under a strict settlement, having power to grant in fee on ground-rent, cannot bind the trustees or remainder-men by covenants, unless in pursuance of the power. But his agreements are evidence of boundaries, and of the situation and condition of the property at the time of the grant.

To what particular piece of land descriptive words in a deed refer, is a question for the jury.

To estop privies by a recital, it must be distinct, not general; hence, where there was a grant of land "along low water-mark to the mouth of a creek, before it was diverted and thrown to the north by the erection of wharves," the parties and privies are not estopped from denying that there was any encroachment by the creek which interfered with the possession of the grantee.

No *right or property* in the privilege of erecting a wharf below low water-mark exists *in the riparian owner* on a navigable river. Hence, where, by reason of the position of other wharves, or the diversion of the course of a stream, the grantee, purchasing for the purpose of wharfing, is disabled from erecting a wharf of the entire breadth of the lot conveyed; he cannot, therefor, claim an apportionment of his rent. Such owner has a right to build to low water-mark; beyond that, the exercise of a privilege is dependent upon license from the state, or those to whom it has delegated that authority.

A debt due by a husband, or one which he had agreed to pay, cannot be set off against the claim for rent due to his wife's separate estate, although she has authorized him to receive the rents without accounting; and in the bill rendered by him, a deduction was made of part of the debt.

Interest is recoverable in covenant for rent, unless there be special grounds for an exception to the rule.

Pleas going to the whole of a count or declaration which answer only a part, are bad on general demurrer.

Pleas by a tenant, that by an agreement of the tenant for life, under a settlement under which the demise was made, and by the adverse possession of a stranger, and by the tortious acts of such tenant for life, he had been kept out of possession of *part* of the land, are answers to part only of the count for rent.

*Nil habuit in tenementis*, to a count in covenant for rent reserved by indenture, is bad on general demurrer.

The plea of eviction by a stranger under title paramount, must aver it to have been by title existing before the demise, and that there was an entry by the evictor.

In error from the District Court of Philadelphia.

*April* 16, 19, 21. This was an action of covenant on a ground-rent deed, in which the principal question below was, whether the

(*a*) This case was argued at the last term, but the judgment was not then given.

defendant had ever been able to get possession of a part of the land granted. The property was situated in the northern angle formed by the river Delaware and Cohocksink creek. It was alleged, that the creek having been diverted from its course by wharves erected on the southern side, and having been made a public highway after such diversion, a long time prior to the grant, by these means a part of the land purporting to be conveyed was covered by the creek, and lost to the defendant. For so much as was thus lost, the defendant resisted the claim for rent. The *narr.* recited scisin in Turner Camac and Sarah his wife, of a lot of ground, beginning at low water-mark in the river Delaware, on the south side of Marsh street, "thence extending southwardly *along the said low water-mark to the mouth of Cohocksink creek, as it was before diverted from and thrown to the northward of its original course, by the erection of wharves on the southwardly side, one hundred and fifty-nine feet, more or less,*" thence up the creek to Penn street, and along Penn to Marsh street, thence to the place of beginning. It then averred a conveyance in 1813 by deed indented, in pursuance of a power reserved in a settlement upon Camac and wife, &c., to Naglee, in fee, of the lot above described, reserving a ground-rent of $437 to the person or persons entitled to the estate under the provisions of said settlement; and that defendant entered and became seised. The *narr.* then deduced the title to plaintiffs, as follows: Mrs. Camac dying in 1825, the estate under said settlement vested in William Camac, and Mary, intermarried with Philip Ricketts, as tenants in common in tail, subject to the life-estate of Turner Camac. In 1830, T. Camac dying, the trustees, under the settlement, conveyed to William Camac and Mary Ricketts in tail. In 1830, Ricketts and wife conveyed to plaintiffs by deed, barring the entail; and by deed of partition with William Camac, the rent in question was allotted to the plaintiffs in trust. The breaches of covenants laid were non-payment of the ground-rents accruing since the death of Turner Camac. To this defendant pleaded covenants performed. 2. Payment of the rent. In the 3d plea, he traversed the allegation of entry by defendant; the deduction of title, the seisin of the trustees under the settlement, and that the rent was conveyed to the plaintiffs by the deeds set out in the narr. On these, issue was joined. He further pleaded, 4thly, That the south-east portion of said lot, of the annual value of $200, had, for thirty years before the execution of any of the said indentures, been in the adverse possession of Clarkson and Hillegas; that an action of ejectment had been commenced in 1806 between those

under whom plaintiffs claim and the devisees, &c. of said Clarkson and Hillegas, which was referred, &c. to ascertain the amount of encroachments, if any there had been, by the erection of a wharf on the south side of Cohocksink creek; and if any encroachments had been made, to report the sum payable therefor; on payment of which the plaintiffs in the action were to release their rights: by which adverse possession and agreement, which was made a rule of court, the defendant had been evicted from and kept out of the premises. 5. Eviction by title paramount against the will of defendant. 6. That by the tortious act of Turner Camac and wife, defendant had been kept out of the enjoyment of parcel of the land of the value of $200 per annum. On demurrer to these pleas, the court gave judgment for the plaintiff.

The title, as given in evidence, was an allottment of the premises to Sarah Camac by partition in 1774; a sheriff's sale to Benjamin Morgan, in 1809, under a mortgage by her; an indenture of February 6, 1812, between Morgan of the first part, Camac and wife of the second, and trustees of the third part, conveying to the trustees the premises sold by the sheriff to Morgan, "*excepting all the southerly part*" of the lot in question, "*originally bounding on Cohocksink creek, which hath been wrongfully claimed by Clarkson and Hillegas, and now in dispute with their heirs,*" in trust for Turner Camac for life, remainder to his wife for life, remainder to their children in common in tail, remainder to the survivor of said Turner and Sarah in fee; with power to said Turner and Sarah, and the survivor, and afterwards to the trustees during the minority of children, to demise at the best rent; or to grant in fee, reserving rents to the persons entitled to the land in the event of no grant being made. On the 5th June, 1813, the conveyance was made by Turner Camac and wife to the plaintiff, which is correctly set out in the *narr.* as above. In place of the usual covenant to build, there was a covenant to erect a wharf. In 1830, the estate of the trustees was conveyed to William Camac and Mary Ricketts, children of Sarah and Turner, in tail; and the estate of Mary Ricketts was conveyed to plaintiffs, to the separate use of Mrs. Ricketts, by deeds mentioned in the *narr.* In the same year, Ricketts and wife, by deed reciting the conveyances already mentioned, and also reciting a deed of Feb. 6th, 1812, by Morgan to T. Camac and wife in fee, for the lots, lands, &c. excepted out of the conveyance of February 8, 1812, conveyed all the property therein mentioned to trustees for the purpose of barring entails; but the recited deed of February 6th was not given in evidence.

The defendant also proved a sealed agreement between Turner Camac and defendant, of the same date with the conveyance, reserving the ground-rent, which, reciting the execution of that deed, and that a controversy existed between said Turner and the owners of the wharf on the south of the creek, whereby its course and true place for entering the river could not be ascertained, nor how much front on the river the defendant could possess and hold under that deed; it was thereby agreed that said Camac and wife would not alien the said rent until the controversy was settled, and the exact front to be possessed and enjoyed by defendant ascertained; and that no more of the rent should be demandable than at the rate of $2 75 for every foot of front actually in the power or possession of defendant under said conveyance: defendant covenanting to carry on the controversy, have the true mouth of the creek and boundary of the lot ascertained, and possession rendered to said Turner, who was to defray the expenses of recovering the possession and damages.

He further gave in evidence the record of an action of trespass and ejectment in 1806, by R. Penn and wife, and Turner Camac and wife, who had previously to 1774 been tenants in common of the premises, plaintiffs against the representatives of Clarkson and Hillegas, with the agreement to refer mentioned in the plea, which agreement was signed by the attorneys of the parties. Also the license of the board of wardens in 1796, authorizing the extension of Clarkson and Hillegas's wharf two hundred and twenty feet from their wharf as it then stood, into the river Delaware; and the act of 1797 declaring Cohocksink creek a public highway of forty feet navigable width. He then gave evidence that Clarkson and Hillegas's wharf was built in 1797, extending into the stream at such an angle as to turn the creek to the northward; and that at the present low water-mark, the distance from the north line of that wharf to the north line of defendants' lot, excluding the forty feet for the creek, is one hundred and seventeen feet nine inches. There was evidence that the river front gave value to the property—that being three or four times the value of the front on the street. There was also evidence as to the precise location of low water-mark in 1813, some witnesses placing it much nearer the shore than at the present time. It will be observed that in consequence of a bend in the river at that place, and the angular projection of Clarkson and Hillegas's wharf, defendants' front at low water-mark is longer as low water-mark is nearer to the shore.

There were, in addition, two questions raised on claims of set-off,

of which notice had been given, but the evidence was rejected by the court. The first was a debt contracted by Turner Camac with defendant prior to the time the rent sued for was accruing. In support of this, defendant offered the written agreement of William Camac and William Ricketts, by which each party agreed to become responsible for one-half the debt.

The second was a similar claim for a debt contracted by William Ricketts after the death of Camac. To support this, defendant offered to show that ' Ricketts was authorized by his wife to collect the rents, &c. due on her separate estate, without requiring an account from him; that he, as the authorized agent of his wife and the trustees, sent a bill for the first half year's ground-rent to defendant, in which there was a credit given for part of this debt claimed to be set off.

The Court (JONES, J.) instructed the jury that it was a question of fact for them whether there had been an encroachment by the diversion of the creek, in consequence of the erection of Clarkson and Hillegas's wharf. If, by reason of the existence of such an encroachment at the date of the deed, the entire river front at low water-mark conveyed in the deed was not obtained, the defendant had a defence *pro tanto*. But if low water-mark was at that time so far within the end of the wharf that there were one hundred and fifty-nine feet front, as conveyed, the plaintiff was entitled to recover. Whether the agreement to refer in the action by Penn *et al.* referred to this encroachment, was for the jury. That the agreement by Camac of June 5, 1813, could not bind the estate, his power being exhausted by the sale; but it was to be received as evidence merely of the state of the premises at that time. For the same purpose, and for that only, was the action by Penn and others admitted. That agreement being signed by attorneys did not amount to a conversion, which would be beyond their power. So as to the license of the wardens, though they had no power above low water-mark, yet that was not conclusive evidence as to where low water-mark was.

As to the interest, if the jury found for the plaintiff, his honour said, the rule is, that rent carries interest from the time it is due, unless it may be inferred from the conduct of the landlord that he does not mean to insist upon it; or unless he acts in an oppressive manner when the tenant is willing to pay what is justly due, or there are other equitable circumstances making the charge improper: that in the evidence there appeared no circumstances to debar this claim. The judgment on the demurrers, and the rejection of

the evidence of set-off, constituted the first six errors assigned. There were also thirteen errors assigned in the charge; as to the effect of the agreement by Camac, of the record of the ejectment, and of the wardens' proceedings; that there might be recovery if possession was taken, notwithstanding the exceptions in the deed of 1812; that the question was, where was low water-mark in 1813, and not whether defendant got his whole front; as to recovery of interest; in leaving to the jury to decide whether the proceedings in the ejectment, the exception in the deed of 1812, and the agreement with Camac, had any reference to the lot conveyed to defendant. There were also exceptions for not answering defendant's points; but as these propositions are negatived in the charge as here stated, it is not necessary to state them at length.

The case was argued at a former term by *Cadwalader* and *Mallery*, for plaintiff in error, and *Williams*, for defendant; and now by

*Cadwalader*, for plaintiff in error.—The principal question was the position of the southern boundary line, which, long before the conveyance in question, had become fixed and permanent, by the erection of the wharf to the south, and the act of Assembly making the creek as it then flowed a public highway. That a portion of the tract was encroached upon by the creek at a very early period, is conclusively shown by the evidence, which can refer to this only, for all the other boundaries are fixed and permanent. It was this encroachment which deprived the defendant of a part of the essence of the grant, viz. the wharfing privilege. That this privilege was the object of the purchaser, is shown not only from the evidence of relative value, but from the covenant to erect a wharf as a security for the rent. This encroachment being thus shown to exist, it is equally clear that at the time of defendant's conveyance the right of the grantors was gone. The lapse of time alone was sufficient; but, in addition to that, there was the agreement to accept a pecuniary compensation from Clarkson & Hillegas, which concluded the right to the realty.

The plaintiffs, by excluding the deed of Camac, have failed to show any title to or grant of this part of the land, since it is expressly excepted out of the conveyance by Morgan. If they have a conveyance, they refuse to produce it, because it would make against themselves. This deduction of title is expressly traversed by the plea, and has not been proved. That deed of Camac was evidence, either by virtue of his estate or in execution of his

power, that the grant was of the land encroached upon. The judge therefore erred in submitting it as a question to the jury, whether there was such an encroachment on the subject-matter of the grant.

Though the fifth plea might have been specially demurrable, yet the want of showing title in the evictor cannot be set up on general demurrer. It is a substantial defence substantially laid: Franciscus v. Reigart, 4 Watts, 116; Ingersoll v. Sergeant, 1 Whart. 352. It is sufficient to aver eviction by title paramount even in case of a tenancy for years, and much more so where the grant is in fee; in which case also the party is not concluded pleading nil habuit, &c. This rule prevails in leases for years, in consequence of the subordinate title of lessee, being no more than a bailiff.

The plaintiffs, claiming under an indenture reciting the encroachment, were estopped denying its existence: U. S. Dig., *Estop. by Deed;* Parker v. Smith, 17 Mass. 413.

There was also a pervading error in the court in considering the question to be, whether defendant at any time got the required number of feet front at low water-mark. It was the appurtenant or incidental privilege of wharfing out into deep water, which was the very object of the purchase. This privilege, it is submitted, passes by the grant of land to low water-mark. To build wharves below that, is a right at common law, and under the statutes relating to wardens. If a license from the crown is obtained, it is no *purpresture:* Hale de Port. 85; and it is lawful, unless found to be a nuisance: King v. Russell, 6 Barn. & Cres. 566, overruled by King v. Ward, 4 Ad. & Ell. 384. This right, it must be admitted, belongs to the riparian owner: Chambers v. Furry, 1 Yeates, 167; Cooper v. Smith, 9 Serg. & Rawle, 33; 8 Watts, 434. And there can be no license to a stranger to use this shore for any purposes of the river; it is exclusively in the owner of the soil: Ball v. Herbert, 3 Term Rep. 253; Hale, 51, 76; Blundell v. Catterall, 5 Barn. & Al. 268. It is like the right of fishing in navigable waters, which was held to be incidental to the riparian owner, who alone can land a net: Bennett v. Boggs, Bald. 60; Hart v. Hill, 1 Whart. 124. This right passes to the assignee: Jones v. Janney, 8 Watts & Serg. 442. The acts relating to fisheries recognise the right—1786: 2 Smith, 370. The charter, art. 6, gives the royal franchise, as to ports, to the proprietary; and in his concessions of 1681, this wharfing privilege in the riparian owner is recognised, as also in the grants of the bank lots in 1689 and 1694. In the second clause of the city charter, it is limited by the discretion of

the city authorities.  The legislation since the Revolution is to the same effect; acts, 1784, 1788, 1793, 1803, 1818; it being apparent that by subsequent accretions, according to the finding of the jury, the river front and wharfing privilege had been narrowed, the court erred in treating this loss or eviction as an immaterial question.

As to the pleas, the fifth is to the whole *narr.;* so is the sixth, for an eviction of a part of the land by the tortious act of a party suspends the whole rent; and the tortious acts averred in the fourth plea are by parties in privity with the plaintiffs.  It would be exceedingly dangerous to hold that such acts of the tenant of the freehold will not bind by reason of a family settlement.  There are many cases supporting this effect of the deed, which is but a recognition of the boundary: Saunders *v.* Annesley, 2 Sch. & Lef. 101.  So, where an account was taken against a tenant for life: Leonard *v.* Sussex, 2 Vern. 527.  As to the set-off, there cannot be a clearer case of an executed contract by a *feme covert,* as to the rents accrued on her separate estate.  The money was her husband's, having been given to him, and the debt was recognised by him as a subject for deduction: 2 P. Wms. 82; 2 Ves. 663; 2 Ves. jun. 715; 4 Ves. 145; 11 Ves. 225; 16 Ves. 116; 4 Sim. 588; 3 Whart. 57.

*Williams,* contrà.—By the various conveyances, the whole title in the lot in question had become vested under the settlement immediately prior to the conveyance to Naglee.  This property, at that time, being the separate estate of Mrs. Camac; the exception in the deed of Morgan, and the ejectment, which was by the former tenants in common, cannot be supposed to have a reference to this land, which is on the north side of the creek, which had flowed in the same course for sixteen years at least, but must have reference to a claim for land on the south bank.  That defendant got the entire front conveyed at the then low water-mark, is found by the jury, and it is capable of demonstration otherwise.  There is no conveyance of a wharf privilege, or any reference or covenant as to any right beyond that line.  Looking at the evidence of the condition of this adverse possession, can it be supposed a purchaser would have bought such a claim—one which it was morally certain could never be enforced?  The collateral agreement with Camac shows this; it was to be a recovery for him; he was to get the possession, and the damages, which it is now asserted had been conveyed to defendant.  As a contract, that deed, if it

referred to the corpus of the previous grant, was only binding on Camac personally, not on the persons to whom the estate was reserved under the settlement. He was incompetent thus to bind the remainder-men even by the deed in execution of the power: 2 Sugd. 331. The agreement in the action worked no conversion; it was signed by attorneys at law. Nor could their principals have produced that effect. They were tenant for life in right of his wife, a *feme covert* and mortgagor: Leigh & Dalz on Eq. Conv. 4, 15, 17. Besides, only the land ascertained by the referees was to be converted, and they have not acted.

As to the set-off, the defendant had showed no act of assent to the proposed deduction. There is no implied gift of the rents, &c. to the husband, but where they have been actually received, and the wife and family supported. The cases cited on the other side all go upon this principle. That in 11 Ves. 225, is clear; there the husband was held accountable for the *last* year's rents. As to the interest on rents, he cited Obermyer v. Nicholls, 6 Binn. 159; Bantleon v. Smith, 2 Binn. 146, where it is put on the right of entry, which was in this deed: Buck v. Fisher, 4 Whart. 516; Dougherty's Est., 9 Watts & Serg. 189. The pleas were defective. A partial eviction, if by a stranger, only apportions the rent, while this professes to answer the whole count: 1 Chit. Pl. 509; Steph. 233; Lattin v. Vail, 17 Wend. 188; Britten v. Webb, 2 B. & C. 483. If the eviction was by the lessor, it must be specially set out: 1 Lilly Ent. 142; 5 Went. 88; a sheriff's sale of defendant's estate would create a title paramount and fulfil the plea. The title of the evictor must be averred to have been *ante dimissionem:* 1 Show, 70; Wotton v. Hale, 2 Sauñd. 181 a; and the distinct act of eviction must be alleged: Ibid.; Comy. Rep. 228; and this defect is bad on general demurrer: Brookes v. Humphreys, 5 Bing. N. C. 55; Fraser v. Skey, 2 Chit. 646. The plea of *nil habuit in tenementis* is bad: Com. Land and Tenant, 539; Palmer v. Ekins, Strange, 818; Ld. Raym. 1550.

*Reply.*—The fallacy is in omitting to notice the incorporeal right which was conveyed and lost by the public highway turned on our land, which works an apportionment: Cuthbert and Kuhn, 3 Whart. 357. It was the ultimate line in deep water, to which the purchaser might acquire the right which was the really valuable part of the grant. There is no pretence for the argument that the exception and the deed of Camac had reference to land on the south side of the creek. That was the southern boundary of the whole estate, of which partition was made in 1774.

The demurrers are not to be judged of by black-letter law, or even by cases shortly after the statute of Ann. The question on general demurrer is, whether the defence is so broadly set out, that issue may be taken upon it.

*Dec.* 13. BELL, J.—The lot of ground conveyed by Camac and wife to the defendant, is described in the conveyance as "beginning at *low water-mark* on the river Delaware, on the south side of Marsh street, &c., thence extending southwardly along the *said low water-mark*, to the mouth of Cohocksink creek, as it was before diverted from and thrown to the northward of its original course, by the erection of wharves on the lower or southwardly side thereof one hundred and fifty-nine feet, be the same more or less ; thence along the several courses of the said creek, on the northerly side thereof, to Penn street," &c.

The defence principally relied on, at the trial of the cause, rests in the averment of the defendant, that, of those one hundred and fifty-nine feet fronting the river, he never had possession beyond one hundred and seventeen feet, because of the prior "encroachment" by Clarkson and Hillegas, made under a claim of right, on the southeasterly side next the Creek. On the other hand, the plaintiffs below insisted that, looking to the line of ordinary low water, as it was in the river Delaware at the date of the conveyance to the defendant, he was let into the possession and enjoyment of the whole front of his lot, extending one hundred and fifty-nine feet along the river shore, at low water-mark, from Marsh street to the mouth of the creek, as it originally existed; and they denied any preoccupation of, or encroachment upon, any part of this front, whereby the defendant was barred of the possession. The rent issuing out of the land conveyed, and which the plaintiffs demand in this action, being in the nature of rent service, resting on the consideration of the tenant's enjoyment of the thing granted, (Franciscus *v.* Reigart, 4 Watts, 98 ; Ingersoll *v.* Sergeant, 1 Whart. 337,) the learned judge, before whom the cause was tried, adopted the principle brought to view by the defendants' second point submitted for the opinion of the court ; that, if by any thing existing at the time of the deed of the defendant, he was prevented of the possession and enjoyment of a part of the property which the deed purported to convey, the amount that might be recovered against him in the action was to be measured by the quantity of land actually enjoyed by him under the deed. The jury was accordingly told that the principal

point to be considered by them was, whether or not the defendant had been shut out from the enjoyment of any part of the premises in the manner of which he complained ? This inquiry seems to have been directed, by both parties, to the river shore, as it was in the year 1813, and much evidence, documentary and oral, was introduced to show the character of the shore and the point of low water before and at that time, with the view of ascertaining the extent of the possession—all of which was referred to the jury, with proper instructions. The verdict found, under these instructions, negatives the alleged fact of failure of possession of a part of the premises near the creek's mouth, and this, of course, settles the dispute as a question *in pais*.

But the defendant complains that the court below erred in their refusal to instruct the jury, as matter of law, that the plaintiffs were not entitled to recover the rent for any portion of the property described in the deed from Camac and wife, which was, in fact, excepted out of the land granted by the indenture *tripartite* of February 6, 1812, though possessed and enjoyed by the defendant. The exception referred to is, *inter alia*, of "all the southerly part of the lot in the plan aforesaid, marked with the number 35, originally bounded by Cohocksink creek, which hath been wrongfully claimed by Matthew Clarkson and Michael Hillegas, and now in dispute with their heirs, or some of them." The plaintiffs deny that the portion of property thus reserved, is any part of the lot granted to the defendant ; but, admitting it to be so, is there any thing in the exception which operates in law to bar the plaintiff's right to recover the rent of the part excepted? The objection rests in the supposed want of title in Camac and wife, when they conveyed to the defendants. It appears, by the recital contained in the deed from Philip Ricketts and Mary M. Ricketts, his wife, to the plaintiffs, of April 10, 1830, that, on the 8th of February, 1812, Benjamin R. Morgan conveyed to Camac and wife, in fee-simple, all the lots, lands, &c. reserved by, and excepted out of, the indenture *tripartite* of the 6th of the same month, which, of course, included the portion now in question. But, setting this aside, as evidence incompetent to affect the defendant, who does not derive title under the deed containing the recital, and therefore is not in privity with it, a sufficient answer to his objection is found in the principle which estops one who accepts an estate, by deed indented, from denying the title of his grantor while he continues in the occupancy and enjoyment of the estate granted: 2 Smith's Lead. Ca., Am. ed. 456, 470, in note ;

Osterhout *v.* Shoemaker, 3 Hill, 518.    Where the action is cove-
nant on a demise, it is within the rule that forbids the tenant to
plead *nil habuit in tenementis,* which all the authorities agree is a
bad plea, if the demise be by deed indented : Palmer *v.* Ekins,
2 Stra. 817 ; Com. on Landlord and Tenant, 538, 539 ; Litt. Sec.
58 ; Co. Litt. 47 b ; a rule which, as I take it, embraces as well
grants in fee, reserving rent, which is the case here, as leases for
life or years : Springstein *v.* Schermerhorn, 12 Johns. 357.    The
direction to the jury, that, if they found the defendant entered
into the whole of the lot described in the deed to him, and held the
possession of it, the plaintiff would be entitled to receive the entire
rent reserved, notwithstanding the exception made in the deed of
the 6th of February, 1812, was, therefore, correct.

Another objection against the plaintiff's right to recover the
entire rent reserved, is supposed to spring from the action of eject-
ment, instituted in the year 1806, in the Circuit Court of the
United States, by Penn and Camac and their respective wives,
against the representatives of Clarkson and Hillegas, and the pro-
ceedings had therein.    The defendant, assuming that the agree-
ment to submit to a reference and the results stipulated in the event
of a particular award being found, amounted to a conversion of the
then plaintiffs' interest in the land, the subject of the ejectment,
into a pecuniary claim for damages, asked the court to say that
thereby the subsequent possession and enjoyment by the defendant
of the whole lot conveyed to him, was rendered impossible.    This
notion was but very faintly urged on the argument, and admits of
easy refutation.    There was certainly no legal conversion of the
title residing in the respective wives of Penn and Camac to the land
in ·question, for there was no legal assurance, proper for such pur-
pose, ever delivered to Clarkson and Hillegas, or their representa-
tives, and it is almost equally clear that there was no equitable
transmutation ; for though a contract to turn land into money,
made between proper parties, will be considered, in equity, as im-
pressing it with the character of money for every purpose of dis-
position, I take it an attorney at law, as such, is incompetent to
affect his client's title to realty, by any agreement he may enter into,
in or out of an action pending, whether directly or by submission to
an award : Pearson *v.* Morrison, 2 Serg. & Rawle, 20 ; Huston *v.*
Mitchell, 14 Serg. & Rawle, 307 ; Gable *v.* Hain, 1 Penna. Rep.
267.    But were this otherwise, the agreement of the attorneys in
this instance lacks that positive, explicit, and imperative character
necessary to render a direction or contract effectual for the equitable

conversion of property, for it depends upon a contingency which has never been executed, and now never can be: Symons *v.* Rutter, 2 Vern. 227; Walker *v.* Denne, 2 Ves. jun. 170; Leigh & Dale, on Eq. Con. 15, 16. Conceding, then, validity to the submission, as such, it remained entirely inoperative as a means of affecting or transferring the title to the land, until carried into effect by the award provided for; and the possibility of this was at an end long before the conveyance to the defendant. It follows the court was right in the opinion expressed that these proceedings did not, as contended by the defendant, render the subsequent possession and enjoyment of the land by him impossible.

Again: the defendant complains of the court below, that it refused to give other effect to the agreement of the 5th of June, 1813, between Turner Camac and the defendant, than as an instrument of evidence to prove the existence of an "encroachment" upon the lot conveyed, as alleged by the defendant. Upon what possible ground the court could have put it, as containing covenants binding upon the present plaintiffs or their *cestui que trust*, or in any way prohibitory of their right to recover in this action, it is difficult to imagine. The paper is, in itself, so inartificially drawn, that it is hard *to guess at* all the objects the parties to it had in view at the time; but this much is certain, that it contains no covenant on the part of Camac, other than that the ground-rent reserved by the previous indenture shall not be assigned until the controversy respecting the alleged encroachment be settled, and that Naglee shall pay rent for no more of the ground conveyed than shall be actually in his power and possession, by virtue of the demise of the indenture, a stipulation conferring upon him no greater immunity than, as has been seen, the law secured to him irrespective of express covenant. But were it admitted that this agreement contains covenants and stipulations which, as against Turner Camac, would be a complete defence to an action brought for the recovery of the rent reserved, it would avail nothing against the present plaintiffs. By virtue of the indenture *tripartite*, Camac and wife possessed the power to demise the land, for years or in fee, reserving the rent for the use of those to whom the land itself was limited by the deed; but neither of them possessed any authority to bind the remaindermen or their trustees, by any special covenant or agreement. These take their estate, not from Turner Camac or his wife, but under the grant in the deed, which gives the latter their estates for life with power to lease. As soon as this power was executed by the conveyance to the defendant, the authority of the tenants for life over

R 2

the subject ceased; and therefore the subsequent act of Camac was altogether without effect to bind the plaintiffs, representing the tenants in tail, even though his wife had joined in it, which, as the power was to be jointly exercised by them, would seem to be altogether necessary.   Something was, however, said on the argument, of the recognition of this agreement by the deed of the same date conveying to Naglee, under which the plaintiffs derive title to the rent demanded, and by which, it is supposed, the declarations and contracts of the tenant for life are made the declarations and contracts of those in remainder.   But how can the deed be said to recognise that which had no existence when the deed itself was made? for the agreement, in truth, refers to and recites the deed as an instrument then existing, and, consequently, the deed takes no notice of the agreement.   But were this otherwise, it is to be recollected the deed of conveyance is the work of the tenants for life, who, neither directly nor indirectly, immediately or by reference to another instrument, could bind the other parties in interest, beyond the authority intrusted to them, which was simply to convey, reserving a rent to certain persons.   The agreement was, however, properly received in evidence, upon the question of the extent of the defendant's possession, under the rule which admits the acts and declarations of particular tenants, affecting their interests, made or done during the tenancy, as evidence against the remainder-men of the disputed fact: 2 Scho. & Lef. 101.

But it is made matter of further exception that the court referred to the jury the question, made on the trial, whether the proceedings in the Circuit Court, the exception contained in the deed of Mr. Morgan, and the agreement of Mr. Camac, referred to the lot of ground granted to the defendant?   It is not perceived how, properly, the court could have refused this.   The construction of a deed or other written instrument is for the court; but the applicability of the descriptions it may contain of things *dehors*, being a question of fact, is necessarily for the jury, and frequently to be determined by evidence *aliunde*.   Such was the case here, although, perhaps, the deeds and other papers contained within themselves strong evidence of the identity of the thing to which they referred.

This brings us to the consideration of the point made on the argument in the court, ascribing to that clause in the deed made to the defendant, which alludes to the encroachment by the erection of wharves on the south side of Cohocksink creek, the quality of an estoppel.   This position does not seem to have been assumed in the court below, nor is it distinctly brought to view by the

errors specifically assigned here. It might, therefore, be passed without comment, but as it was much insisted on, it is thought best to notice it as a feature of the cause. The complaint is, that though the conveyance to Naglee refers to the encroachment as interfering and covering part of the land conveyed, the court left it to the jury to say whether such encroachment interfered with the possession of the defendant or not ? Doubtless the clause alluded to was received and treated as some evidence of the fact of encroachment, and consequent exclusion of a possession commensurate with the extent of the grant; but the defendant, not satisfied with the measure of vigor so accorded to it, contends it should have been held conclusive of the disputed fact. It is said the plaintiffs, as claiming under the deed, are bound by all that appears on its face. It is undoubted that a material fact, distinctly and unequivocally averred in a deed, will estop parties and privies to it from alleging the contrary; for no man, as is said by Lord Mansfield in Goodtitle v. Bailey, Cowp. 601, shall be allowed to dispute his own solemn deed. On the other hand, it has been said by high authority, that when averments are introduced by way of recital, though they are competent evidence, yet so far are they from being conclusive, they are entitled to less respect than oral confessions: Mehaffy v. Dobbs, 9 Watts, 379. Perhaps it is not easy to reconcile all the authorities upon this subject; but one rule is certainly to be extracted from them, namely, that a statement in a deed to operate an estoppel must be certain, precise, and particular, and not merely general. The rule is thus expressed in Roll's Abr. tit. *Estoppel*, P. pl. 1 & 7, speaking of a bond: " If the condition contain a *generality* to be done, the party shall not be estopped to say there was not any such thing. But in all cases, when the condition of a bond has reference to a particular thing, the obligor shall be estopped to say there is no such thing." In Salter v. Kidley, 1 Show. 59, Lord Holt says, that a *general recital* is not an estoppel, though recital of a *particular fact is;* and in Doe d. Jefferys v. Bucknell, 2 Barn. & Ad. 278, when a party had covenanted with a mortgagee that he was "legally or equitably entitled," a subsequent mortgagee was held not to be estopped from setting up the legal estate acquired by the mortgagor after the first mortgage, because, as was observed by Lord Tenterden, in delivering the opinion of the court, " there is a want of *that certainty* of *allegation* which is necessary to make it an estoppel." To the same effect are our own cases of Mehaffy v. Dobbs, *suprà*, and Ingersoll v. Sergeant, 1 Whart. 355, 356, where it is said a party will

not be estopped by the recital of a *generality* merely. If, then, in the case in hand, the objection that the admission of an "encroachment" by the tenant for life ought not to be received to bind those in remainder, be waived, the inquiry is presented, is there any such precise and certain statement or admission as should close the mouths of the plaintiffs from alleging the truth? To my mind, the answer presents itself without difficulty. Nothing can be more general and inconclusive than the clause sought to be invested with a conclusive character. It is "along the said low water-mark to the mouth of Cohocksink creek, as it was before diverted from and thrown to the northward of its original course by the erection of wharves." How far the "encroachment" infringed on the original course—whether one inch, or one hundred feet—is not even hinted at. Nay, it is not expressly averred that it continued to exist at the period of the conveyance, nor is there any thing to show, except inferentially, that the defendant could not, at once, have possessed himself of the whole one hundred and fifty-nine feet conveyed. Without labouring the argument, it is, perhaps, sufficient to say that the extent and continued existence of the alleged encroachment being thus left at large, was open to the inquiry of the jury, as matter of fact, both as to its continued existence and its alleged extent. It was, certainly, competent to the plaintiffs to show that it interfered not with the defendant's possession beyond one inch, and if so, to prove it did not interfere *at all;* for, the inquiry once entered upon, there was nothing in the deed itself to limit a point at which it should be stayed.

But upon this point of possession another *grave question* has been started here. I have said that, on the trial, both parties seemed to confine the inquiry to the river shore, extending from Marsh street to the mouth of Cohocksink creek, and the charge of the court was certainly based upon this view of the subject of litigation. It is now, however, urged that the fallacy of the charge consists in the assumption, that if the defendant enjoyed possession of the whole of the river shore described in the deed, he got all that passed by the grant, though by the peculiar position and construction of Clarkson & Hillegas's wharf he was deprived of the usufruct of a wharf to be built in the tide-way of the river, below low water-mark, within parallel lines perpendicular to the shore. The defendant's covenant, contained in the deed of the fifth of June, shows that the lot was purchased by him and conveyed by Camac and wife, with a view to the erection of a wharf, and the position is that the right to erect it, in the manner

I have mentioned, passed by operation of law as appurtenant to the lot, the exercise of which right being rendered impossible by the previous encroachment existing on the southwardly side of the creek, the grantee is entitled to a deduction for the rent reserved to an amount proportionate to the diminution to which his wharf front in deep water has been necessarily subjected. It is difficult to resist the impression that this idea is a second thought, suggested by the failure to show an exclusion of possession at the creek's mouth, as it was originally, for there is nothing in the record indicating that this attitude of defence was assumed below, and, certainly, the particular attention of the court was not called to it by the points submitted for its opinion. But being presented here, and urged upon our consideration, a short examination of its merits is perhaps due to the peculiarities of the case.

If the absolute right to erect a wharf below low water-mark passed by the deed to the defendant, it must have passed as something annexed to or appurtenant to the lot, absolutely necessary to its enjoyment; for there is, certainly, no language used in the conveyance itself that looks farther than the low water-mark. But an appurtenant or necessary incident of land is as much the subject of dominion and property as the land itself, and, of course, if the grantor was vested with no such dominion, the thing supposed to be appurtenant could not pass by his grant, nor shall it be intended, in absence of express manifestation, that the parties intended it so to pass.

The inquiry, then, is narrowed to the single point, whether a riparian owner on a navigable stream can, for any purpose, assert an interest in the soil beyond low water-mark, or a determinate right issuing out of it? This inquiry admits of but one answer. In England, and in this country, the space between high and low water-mark on navigable streams belongs to the owner of the adjacent soil, and hence the right, within this limit, to set up a wharf, crane, or other contrivance, in a port-town, for the profit of the owner; for every man may make the most of his own; Hale de Portibus Maris, 77; Cooper v. Smith, 9 Serg. & Rawle, 32. But the bed of a navigable river is there vested in the crown; and here, in the Commonwealth, for the use of the whole community, and no private man can challenge an individual interest therein. This is so familiar a principle, that I shall not stop to cite authority to sustain it, further than to quote the remarks of Baldwin, J., in Bennett v. Boggs, Bald. 72, 73, that by the grants to the proprietors of New Jersey and Pennsylvania, they held only to the river

Delaware respectively, and could not claim any part of the bay or river below low water-mark; the right to the entire bed of which remained in the crown until, by the Revolution, this was vested in the states in their sovereign capacity. But admitting this, the counsel for the defendant urges that a right to push wharves and other erections into the stream of such a river as the Delaware, is necessary to the exigencies of trade and commerce, and may, therefore, for public convenience, be properly exercised by the owners of the adjacent shore. In support of this notion, he cited the oft-repeated passage from Lord Holt's treatise, *De Portibus*, 85, that "it is not every building below the high water-mark that is, *ipso facto*, in law a nuisance; for that would destroy all the quays that are in all the ports of England, for they are built below the high water-mark; for otherwise vessels could not come to them to unload, and some of them are built below the low water-mark. And it would be impossible for the king to license the building of a new wharf, whereof there are a thousand instances, if, *ipso facto*, it were a common nuisance." But Lord Denman, in King *v.* Ward, 4 Adol. & El. 384, overruling Rex *v.* Russell, 6 Barn. & Cress. 566, points out that, in this passage, Lord Holt is only disputing the doctrine that "every building below the low water-mark is, *ipso facto*, a nuisance, which, as he remarks, his observations on existing quays, and on such as may have been erected under the king's license, effectually disprove; and Lord Denman proceeds to answer the argument repeated in the present case, by referring to the evil which might follow encouragement given to capitalists and adventurers to interfere with known public rights from motives of personal interest, upon the speculation that the changes introduced by them might prove, ultimately, a public benefit. That Lord Denman was right in his interpretation of Lord Hale, is further shown by what immediately follows the passage quoted: "Indeed," continues that great jurist, "when the soil is the king's, the building below high water-mark is a *purpresture*, an encroachment and intrusion on the king's soil which he may either demolish, or seize, or arrest, at his pleasure, but it is not *ipso facto* a common nuisance, unless, indeed, it be a damage to the port and navigation." In such a case, the question may be, nuisance or no nuisance; but it will not admit of doubt that without the king's license it is always a *purpresture*, or attempt, without authority, to appropriate to individual profit what equally belongs to all. In harmony with this are all our statutes respecting the navigation and improvement of the rivers Delaware and Schuylkill, beginning with the act of

1784, which enlarges the power of the wardens of the port, and running down through the acts of 1793, 1798, 1799, 1803, 1806; and 1818, directing applications to be made to the board of wardens for license to erect wharves and prohibiting such erections and other obstructions below low water-mark without a license, under heavy penalties. Indeed, the act of 1818 would seem to go a step further; for it prohibits, except by consent of the wardens or Court of Common Pleas, on appeal, the building a wharf into the tide-way of the river Delaware, without any reservation of private right to low water-mark; but this was, perhaps, by inadvertence. This review conclusively establishes that nothing, corporeal or incorporeal, below low water-mark, passed by the deed of Camac and wife to the defendant, and, consequently, he cannot hold the grantors, or those in privity with them, responsible for a disappointment of any expectations he may have entertained inducing the purchase. To low water-mark he might build of his own mere motion, further than that, his volition was dependent upon and to be governed by the discretion of others whom the lord of the soil has intrusted with jurisdiction over the subject. Upon his application, *in pursuance of the statutes* that jurisdiction has been exercised precisely, to the extent of the privilege asked by him, and having conformed to its direction, he cannot now be permitted to make it a subject of complaint against the plaintiffs, that his artificial erection is not so commodious as it might have been, had not Clarkson and Hillegas projected their wharf into the stream in a particular direction. This, also, was done by the license of the wardens, who were authorized to permit it, unless, indeed, it interfered with the public highway of Cohocksink creek. In that event, the remedy for its removal would be by indictment for erecting and maintaining a public nuisance; but, for the reasons already given, the defendant cannot set it up as a defence to the action, though those who conveyed to him may have entertained the opinion they were seised or possessed of some estate or interest below low water-mark, and contracted under this misapprehension. Whatever may have been the idea entertained by the grantors, they entered into no covenant of title, nor stipulated for the defendant's quiet enjoyment beyond the shore, nor did they attempt, in terms, to convey further. There is, therefore, nothing in this part of the case by which the plaintiffs can be affected, were it even admitted, the tenants for life could bind them in this particular.

In addition to these several matters of defence, the defendant offered to set off against the plaintiffs' demand a debt due to him

from Mr. Ricketts, the husband of the *cestui que trust*, upon the ground of her consent that her husband might receive the rents of her separate estate, without accounting; accompanied with proof that the husband had sent to the defendant an account of the first year's ground-rent, from the amount of which there was a deduction of part of the debt offered to be set off. This offer the District Court properly rejected. Unquestionably, a married woman, having a separate estate, may give it to her husband, or agree that he may receive the rents and profits during coverture; and if she permit him to receive the income, without complaint, it is evidence of her assent : Powell *v.* Hankey, 2 P. Wms. 83 ; Pawlet *v.* Delaval, 2 Ves. 663 ; Parkes *v.* White, 11 Ves. 225 ; Towers *v.* Hagner, 3 Whart. 57. But it is not perceived how this principle applies, to enable a debtor to set up such an agreement as the foundation of a set-off of the husband's debt, in an action to which he is not a party, and in which he has no interest, brought to recover money due to the trustees of the wife. The consent offered to be proved, was, that the husband might receive, without being held to account; but he was not bound to receive, and the consent might be revoked, at any time ; so that until he did receive, the rents remained the property of the plaintiffs, for the use of the *feme*. The actual receipt, with the understanding that he shall hold, without accounting, is what makes the sum received the husband's. No such receipt was averred here, and a mere offer to receive is not equivalent. If, indeed, the husband, with his wife's consent, had settled with the tenant, by allowing the latter a credit for the debt due to him, by way of deduction from the rent accrued, and received the balance, thus closing the annual account, the question would have presented a different aspect. But that is not the case. The transaction, as disclosed by the paper book, is nothing more than an offer thus to account and receive by the husband, and a refusal by the tenant, leaving the respective rights of the parties precisely as they stood before the offer was made.

The proposal to set off a moiety of the debt, due from the estate of Turner Camac, the payment of which was assumed by Mr. Ricketts, rests upon the same insufficient foundation with the first offer, and for the same reasons. The fact that, probably, the agreement of the husband was made in reference to the rents, due to his wife's separate estate, which, by possibility, he might come to enjoy, gives the defendant no claim on that estate for payment. Nothing is pledged but the personal liability of the husband, and to this the defendant is alone entitled to look.

The sixth exception to the charge of the court is groundless. The direction on the subject of the payment of interest was given in terms as favourable to the defendant as he had any right to ask. Indeed, the principle recognised in Burk v. Fisher, 4 Whart. 516, would seem to admit the application of a much more stringent rule as to the tenant's liability for interest on arrears of ground-rent, than that drawn by the judge below from Obermyer v. Nichols, 6 Binn. 159. But it is sufficient that there is nothing here of which the defendant can justly complain.

It remains only to consider the sufficiency of the special pleas, demurred to by the plaintiffs, with which the record has been, as it appears to me, unnecessarily burdened. The only office performed by these pleas has been to complicate the inquiry, since the defendant has had the advantage of every matter of defence suggested by them, upon the evidence given under the notice of special matter. If, therefore, they shall be found, on technical grounds, to be inefficacious, the conclusion will be unaccompanied by the fear which sometimes attends such a result, that, possibly, a meritorious defence has been excluded.

Upon the argument, many objections were urged against the validity of these pleas, which seem to have been prepared without much apparent regard to the rules that point out their requisite features. Most of these objections are fatal; but it will be sufficient to notice two of them. The first, applicable to the fourth and sixth pleas, is, that although each of them begins with an answer to the whole of the plaintiffs' declaration, the matter pleaded is, in truth, only an answer to a part. The *narr.* goes for the entire rent of the lot of land granted to the defendant, and the pleas, though professing to take defence as to the whole, deny only the plaintiffs' right to recover a part of the rent, which, as we have seen, may be apportioned. The residue of the demand is unanswered. Such a defective and partial plea is a nullity, and may be demurred to : Weeks v. Peach, 1 Salk. 179 ; 1 Saund. 28, n. 3 ; Archb. Pl. 168 : and this, whether the cause of action be set out in several counts, or in one count only : Earl of Manchester v. Vale, 1 Saund. Rep. 27 ; Woodward v. Robinson, 1 Stra. 302 ; Nevins v. Keeler, 6 Johns. 63 ; Union Bank v. Clossey, 11 Johns. 182 ; Hallett v. Holmes, 18 Johns. 28.

The second objection is applicable to all the pleas demurred to. The last two are, in form, pleas of eviction from the whole or part of the premises out of which the rent demanded issues, and the fourth is either a *nil habuit in tenementis*, which, in covenant, is bad

S

on demurrer: Comyn on Landlord and Tenant, 539; Palmer *v.* Ekins, 2 Ld. Ray. 1550; S. C. Stra. 817; or it is tantamount to a plea of eviction.   But neither of the latter pleas set out the name of the evictor, or allege that he entered upon the defendant's possession by virtue of a *lawful title acquired before or at the time of the grant to the defendant.*   This averment is, absolutely, essential to the sufficiency of such plea, for though *habuit jus et titulylum,* &c., is said to be well enough in pleading eviction by a stranger, because it is not supposed you know his title, you must add *ante dimissionem;* otherwise, it shall be intended the evictor derived his title from the tenant himself, and the plea is bad, even after the verdict: 1 Leigh's N. P. 699; Jordan *v.* Twells, Ca. temp. Hard. 171; Wotton *v.* Hale, 2 Saund. 175 and 181, n. 10; Foster *v.* Pierson, 4 Term Rep. 617; Hodgson *v.* East India Company, 8 Term. Rep. 281.   It is true, the sixth plea alleges, that by the tortious act of Camac and wife, the defendant was kept out of possession; but it does not aver *they* entered upon the defendant's possession, or that they kept him out of possession; and, if it did, it is deficient in the other important particular pointed out.   As to the fourth plea, if it intends to aver that Clarkson and Hillegas were the evictors, it contains no allegation of any right or title in them, before or at the time of the grant; and as the grantors did not covenant against the *tortious* acts of strangers, or for quiet enjoyment of the grantee—at least, it is not so averred in the plea— an illegal entry upon the possession of the defendant, or keeping him out of possession by a third person, cannot affect the plaintiffs' right to recover in this action.   The conclusion arrived at *below* on these demurrers was, therefore, right.

What has been said embraces every material point made in the case.   It will be perceived no error was committed by the District Court.

Judgment affirmed.