## Laughlin *et al. versus* Harvey.

Error to the Court of Common Pleas of *Allegheny county.*

This was an action of *assumpsit* by John Harvey against James Laughlin, Richard S. Hayes and Henry Laughlin, partners as Laughlin & Co.

The suit was on this note :—

" $4160.                    Pittsburgh, July 26th 1861.

" One year after date we promise to pay to the order of John Harvey, at the Pittsburgh Trust Company, forty-one hundred and sixty dollars, in gold, without defalcation, for value received.
                    (Signed)    " Laughlin & Co."

The plaintiff averred that on the 18th of December 1862, and at other times after the maturity of the note, he demanded payment of the note in gold, or if the defendants had not the gold, that he would accept United States legal-tender notes, adding the premium on gold, which was then 33 per cent.

The defendants, by their affidavit of defence, averred that upon the demand of the plaintiff they tendered him the amount of the note and interest in legal-tender notes, which he refused, and that they have always and now are ready and willing to pay him in the same manner ; that at the maturity of the note, and at the first demand, the premium on gold was 14½ per cent., and at the second demand it was 30 per cent. ; that the consideration for the note was notes of banks which had suspended specie payment.

[Laughlin v. Harvey.]

The court entered judgment, for want of a sufficient affidavit of defence, for $5002.15, the amount of the note and interest, adding 14½ per cent. for premium on gold. This was assigned for error.

*Hamilton & Acheson*, for plaintiffs in error.—This note was made before the Legal-Tender Act of Congress. The word "gold" expressed no more than the law would have then implied; it was the legal medium of paying pecuniary contracts. The law, as it then stood, was a part of the contract as if it had been expressed in it. What therefore was the legal standard of value cannot be treated as a commodity: Shoenberger v. Watts, in Dist. Ct. of Phila.

*Kirkpatrick & Mellon*, and *J. H. Hampton*, for defendant in error, submitted the argument of Denio, C. J., in New York, in Meyer v. Roosevelt.

They argued that the failure to keep up the tender and bring the money into court rendered defendants liable for interest from the maturity of the note. and costs: Sheredine v. Gaul, 2 Dallas 190 ; Seibert v. Kline, 1 Barr 38 ; Harvey v. Hackley, 6 Wright 264 ; Pennypacker v. Umberger, 10 Harris 495 ; Henry v. Raiman, 1 Casey 361 ; Williams v. Bentley, 3 Id. 302 ; Heaward v. Hopkins, Doug. 431 ; Rawson v. Johnson, 1 East 203 ; Peters v. Opie, 2 Saund. 352, n. 3 ; 1 Chitty's Pl. 315.

---

Each of the judges delivered an opinion on the 24th of May 1865, at Harrisburg.

WOODWARD, C. J.—Daniel Webster expressed the universal thought of the country when, in his speech in the Senate on the specie circular in 1836, he held the following emphatic language: "Most unquestionably there is no legal tender, and there can be no legal tender in this country, under the authority of this government or any other, but gold and silver—either the coinage of our own mints, or foreign coin at rates regulated by Congress. This is a constitutional principle perfectly plain, and of the very highest importance. The States are prohibited from making anything but gold and silver a tender in payment of debts; and, although no such express prohibition is applied to Congress, *yet, as Congress has no power granted to it in this respect but to coin money and regulate the value of foreign coin*, it clearly has no power to substitute paper or anything else for coin as a tender in payment of debts and in discharge of contracts:" Webster's Works, vol. 4, p. 271.

If any mind, long accustomed to setting up personal or partisan conceits above the plain letter of the Constitution, had affected to find in the enumerated grants the power of Congress to make paper

[Shollenberger *v.* Brinton.]

money a legal tender in the *future* dealings of men, even such latitudinarian constructionists would not have pretended to apply the power to *existing* debts and contracts, for they would have recalled the fact that governments are instituted to *enforce*, and not to *destroy*, private contracts ; and that the Constitution guards this great end of government so carefully that it expressly forbids any State, in virtue of its general, reserved and undelegated powers, to pass any law impairing the obligation of contracts, whilst it delegates to the legislature of the Federal Government no power to pass such a law. In this sentiment, the inviolability of private contracts, American minds were, a few years since, an absolute unit. And it gives me pleasure to record the fact, because a sensitive regard to the obligation of contracts is a rule of morality that binds communities and nations as well as individuals, and is the more honourable when, as in the instance of nations, there can be no legal remedies to enforce it.

The people who framed and adopted the Constitution of the United States had a common law which made gold and silver the only legal tender, but under the Articles of Confederation the States had more than once, by advice of the Congress, substituted paper money, and thus the people knew by personal experience what was best ; and when they put it into their fundamental law that no State should make anything but gold and silver a legal tender, or pass any law impairing contracts, and withheld from the Federal Government all power to do these things, they gave the highest evidence they could give of their determination to have a metallic standard of values, and to have contracts executed according to their tenor.

Yet, on the 25th day of February, 1862, the Congress of the United States passed an Act, authorizing the issue of United States notes to the amount of one hundred and fifty millions of dollars, and declaring that they " shall be lawful money, and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest on public bonds."

The first thing to engage my attention, in considering the constitutionality of this Act of Congress, is the expression, "*all debts, public and private.*" The debts of a country always bear a necessary relation to the currency of the country, though at all times they greatly exceed it, because every dollar of currency is expected to be used several times in paying debts , and so long as a specie basis is maintained, currency can be, and is actually so used. The entire currency of the country—the paper money of the States, as well as all lawful money of the Federal Government, whether paper or specie—would have to be multiplied, therefore, many times, to express the aggregate of public and private debts. What was that aggregate at the date of this enact-

[Shollenberger *v.* Brinton.]

ment ?  I have had neither the leisure nor the means at command to make even an approximate estimate of it, but when we consider that it would include very much of the indebtedness of the Federal Government, all the debts of all the State governments, the debts of counties, cities, boroughs, townships, and every species of municipality; the debts of all corporations, associations and partnerships, as well as the debts of individuals, however secured or evidenced; we see that the aggregate must have been immense—a sum to be counted by hundreds of millions of dollars, and the figures to express which would be too unwieldy for the purposes of a judicial opinion.  But it was not all due on the day this law was passed, and therefore did not require a legal tender commensurate with itself.  The one hundred and fifty millions of greenbacks, as they are familiarly called, and the sums issued under similar Acts subsequently passed, were perhaps equal to the actual indebtedness of the country due that day; and as they, when used to pay debts, would fall back into the circulation of the country, they would, like all other currency, multiply themselves many times as legal tenders, and, in a period of years, serve to pay very much, if not the whole of the vast indebtedness of the country, as it would from time to time fall due and become payable.  The Act has been in operation for three years and more, and has furnished the legal tender for paying the debts that have fallen due, duties and interest on public bonds only excepted; and if it shall last for any considerable time, every debtor will avail himself of it when his pay-day comes.

Now, such being the nature and obligation of all the debts of the country (excepting always those excepted in the statute and the inconsiderable sums contracted to be paid in specific chattels), let us look for a moment at the effect of the statute upon them. Since the date of the act the premium on gold has risen to 160 per cent., and has fallen, in the present month, to 30 per cent., and between these extremes it has touched all points by a continual fluctuation.  If the average premium should be assumed at 100 per cent., it would be equivalent to an average discount of 50 per cent. upon the legal tender provided by the Act of Congress, and one-half of every debt paid by it has been sacrificed. But if 50 should be assumed as the average premium, the discount on greenbacks would be about $33\frac{1}{3}$ per cent., showing the operation of the law to have been a sacrifice of a third of the debts falling due.  From such observations as I have been able to make, I believe the average discount since February, 1862, to have been about 40 per cent., so that, for the purposes of the present discussion, 33 per cent. may be very confidently assumed. Assuming that the aggregate of debts at the date of the law exceeded the entire currency of the country, it is material to observe that every dollar of these debts, except in the inconsiderable

2 P. F. Smith—3

[Shollenberger *v.* Brinton.]

instances otherwise specially expressed, was contracted upon the specie basis, and liable and entitled to be demanded in gold or silver coin. Not that, in point of fact, they would have been so paid; for in a sound state of the currency the legal tender is rarely demanded; but, in point of law, they were all payable in the legal tender of the country, and in nothing else. Such was the tenor and obligation of the contracts out of which that vast indebtedness grew. Debt is the creature of contract; and the law of the land at the time a contract is made, enters into, permeates, and incorporates itself with the contract, and becomes an essential element of it, as much as if it were expressly recited in the text of the contract. According to the law of the land, before the 25th of February, 1862, gold and silver were the only legal tender in payment of debts; and every debt, unless the contrary were expressly stipulated, was legally payable in nothing but gold or silver.

In some of the ground-rent cases before us the contract was *expressed* to be payable in gold or silver; and in one of them the weight of the silver dollar to be paid is expressly fixed at 17 pennyweights and 6 grains, or 414 grains, which is one and a half grains heavier than the silver dollar, as fixed by the Act of Congress of 18th January, 1837; but in all of these ground-rent covenants lawful money of the United States is stipulated for; and at the date of the contracts nothing but gold or silver was lawful money for the purpose of paying debts. It may be granted, that where the parties had agreed upon a heavier silver dollar than that in common use, the difference would have to be compensated in current dollars; but where gold or silver was stipulated for, without mentioning the weight of the coin, the lawful dollar for the time being would be intended. Where coin was not mentioned at all, but only lawful money of the United States, the creditor would have the right to demand, and the debtor was bound by his contract to pay so many dollars in the current gold and silver coin of the United States, or in foreign coin at the rates prescribed in existing Acts of Congress. The diversities in these covenants, therefore, may be disregarded for present purposes; and if they are debts at all (which shall be considered hereafter), they may all be placed on the same footing as other debts; that is, debts which, by the law of their creation, can be legally extinguished only by the tender of gold or silver coins at their statute rates.

What, then, was this Act of Congress but an invitation to debtors to take a depreciated paper currency and pay off their debts at the rate of fifty, or, at most, sixty-seven cents in the dollar? What but a cancellation, a blotting out of all that part of the debts of the country which represent the difference be-

[Shollenberger *v.* Brinton.]

tween paper money and coin ? What was it but confiscation of thirty-three dollars in every hundred of debts ?

Debtors were not slow to yield to the temptation. Purchasing the treasury notes with other paper money, they sought their creditors as keenly as sometimes they elude them, and paid off immense sums in a currency that violated the obligation of the contract. These suits now before us involve a struggle between parties to contracts to keep them on the ground on which they were originally based, or to get them on the new ground laid by this Act of Congress.

The immediate question we have to decide is : Was Congress intrusted with power by the Constitution to make such havoc of private rights and to impair the obligation of every money contract in the land ?

Those who hold the affirmative of this question ought to make the source of such a power very plain. It is not too much to ask them to point out the words in the written document we have to deal with, which, being read according to their grammatical and historical meaning, did expressly, or by necessary implication, vest in Congress this destructive power. It is one of the infelicities of the occasion that the advocates of the power are not agreed as to the part of the Constitution they will make responsible for it. Some charge it on the coining power, some on the borrowing power, some on the war power, some on the clause relating to commerce ; whilst others state the argument more comprehensively though less definitely, as is printed in one of our paper-books, in these words : " If to carry on war, regulate commerce, or maintain a navy, it be necessary to make paper money and give it a legal-tender character, or to carry into effect any other substantive power under any circumstances, Congress has the power by implication. The degree of necessity is a question of legislative discretion, not of judicial cognisance."

In view of these inconsistent derivations of the supposed power, it is quite natural to doubt whether it was conferred at all, though if the argument above quoted be sound, it makes an end of all controversy on the subject, for it resolves the government into the unrestrained will of Congress. As that argument is the substance of much that has been said and written in behalf of the power, let it be examined for a moment. If, to execute a granted power of the Constitution, Congress should conceive it necessary to revoke all the land titles of the country, to abolish the marriage relation, to substitute primogeniture for our systems of intestacy, or to do any other preposterous thing which may be imagined, the argument is, that the power must be implied, and the degree of the necessity is not subject to judicial cognisance. Not so thought Chief Justice Marshall and the Supreme Court of the United States, in McCullough *v.* The State of Maryland, 4

Wheat. 316, and in Osborne *v.* United States Bank, 9 Wheat. 816, where the doctrine was asserted that it belongs to that court to make the final decision upon constitutional questions, and that the clause conferring power to make " necessary" laws for carrying granted powers into effect meant not an absolute physical necessity so strong that one thing could not exist without the other ; but if the end be legitimate and within the scope of the Constitution, all means which are appropriate to this end, and which are not prohibited, are lawful. This is the judicial test of necessary laws, and according to it, those who support this Act of Congress must begin by showing that impairing the obligation of contracts and blotting out from a third to a half of the debts of the country are legitimate " ends" of the Constitution and within its " scope." Because, until this is established—until these ends are shown to be legitimate fruits of the Constitution, results which it was planned and framed to produce—there can be no question raised about "necessary" means. It were idle to discuss appropriate or necessary means to an impossible or inadmissible end. Or, will we reverse that maxim of questionable morality which teaches that the end justifies the means, and say that whenever means are satisfactory to a majority in Congress the end must be legitimate. If so—and this is the highest point to which I have seen the argument pushed—then our Constitution is waste paper, and Judge Marshall's declaration, in the above cases, that the Government of the United States is one of enumerated powers, and that it can exercise only the powers granted to it, is nonsense. If, however, any man can demonstrate that the Federal Government was formed for so base a purpose as the impairing the obligation of contracts, I give up the controversy, and I agree that this Act of Congress was appropriate, if not necessary, to *that* end. But if, on the other hand, the government was formed to enforce contracts and protect private rights, it has not been shown, and it cannot be, that the legislation in question was ordinary, appropriate or necessary.

Coming now to a more direct treatment of the question before us, it is to be observed that the power to declare anything a legal tender is nowhere expressly conferred in the Constitution. But a power necessarily incident to another that is clearly granted, may be implied ; and I think the power to make gold and silver coin a legal tender may be legitimately implied from the clause empowering Congress " to coin money, and regulate the value thereof and of foreign coin, and fix the standard of weights and measures."

To coin money, is to stamp metal and convert it into coin ; and to regulate the value thereof, is to declare, by proclamation or statute, the value of the coin as a currency, and thus essentially, if not necessarily, to make it a legal tender in payment of debts. This is an act of sovereignty which, in some countries, has been

applied to other substances than metals, but which was granted to Congress solely for the purpose of coining the precious metals that the people might be supplied with a uniform and pure metallic standard of values throughout the Union: Marigold's Case, 9 How. 560.

Such metals, when coined and made lawful money, and foreign coins, would have been legal tenders in payment of debts by the common law, quite irrespective of statutes; but we have had several statutes since the adoption of the Constitution to regulate the value of coins, both foreign and domestic, and to declare them legal tenders according to their statute values. Thus the Act of Congress of 2d April 1792, establishing the mint, carried out the idea of the Constitution by declaring that, "there shall be from time to time struck and coined at the said mint coins of gold, silver and copper, of the denominations, values and descriptions" therein-afterwards described, and the sixteenth section made these gold and silver coins a legal tender. The Act of 18th January 1837, supplementary to the above law, reduced the weight of the silver dollar, and made the gold and silver coins of the mint a legal tender. By the Act of April 1806, foreign gold and silver coins shall pass current as money, and be a legal tender at the respective values assigned them in the statute. The copper coinage of the mint was not made a legal tender by these statutes, and, though lawful money of the United States, has been judicially declared not to be a legal tender: McClein v. Nesbitt, Nott & McCord 519.

Many other statutes have been passed on the subject; but these are enough to show how Congress has exercised the constitutional grant of coining money and regulating the value thereof, and how the power of prescribing a legal tender has been treated as incidental to this express grant. To what end was a mint provided with assayers, engravers and all appliances for coining the precious metals, with dies for stamping the coin, and the penny-weights and grains of the respective coins prescribed by statute, if this grant of the Constitution had not reference to metallic currency? If to coin money meant to stamp or print paper, as is sometimes argued now-a-days, here was a very bungling, expensive and ill-contrived execution of the power; and it is wonderful that all the Congresses before that of 1862 had not found out the more convenient and expeditious mode. In my apprehension, the legislation before 1862 was strictly constitutional, as I am sure it was reasonable and beneficial; and let it never be forgotten that every contract for the payment of money, which existed in the United States on the 25th of February 1862, had been made on the faith of that legislation, and was, therefore, capable of being discharged only by gold or silver coin. That was the law of the land, and, therefore, it was the law of all the contracts of

the land. And no legislative power could alter that law, except for future contracts, without impairing the obligation of contracts and violating faith.

If I am right in treating the power to make anything a legal tender as an incidental power, and if that incident has in all our history been annexed to and exercised with the power of coining, then I conclude it does not belong to the war power, or to the power to regulate commerce with foreign nations and among the several states and with the Indian tribes.

Is it incidental to the power to borrow money? I agree that the Act under consideration was, in some sort, a law for borrowing money, though it is not so entitled. By making a depreciated paper currency a legal tender every debtor was tempted to take it of the government, in exchange for other paper money, and pay off his specie debts with it. I have already shown that the effect of the Act was to annihilate from a third to half of the indebtedness of the country. Was that borrowing money within the meaning of the Constitution? If Congress had required every creditor to assign to the government a third or half of his bonds, notes, mortgages, ground-rents and other money securities, that might have been considered a forced loan; but when a creditor is required to take depreciated paper in satisfaction of a debt contracted on the specie basis, it is more like confiscation than it is like the constitutional right to borrow money. Having the right to borrow money, Congress has an undoubted right to issue evidences of indebtedness therefor; and I will not dispute their right to declare these evidences lawful money, so that men may deal with it in *future* contracts; but I do very earnestly deny the right and power of Congress to make such "lawful money" a tender in payment of *past* contracted debts. It was an intrusion of governmental power upon the relation which creditors and debtors had established between themselves on the faith of prior legislation. It was an impairing of the obligation of that relation. It was tempting men to breach of good faith, and, therefore, not only unconstitutional, but of extremely evil example.

It is no part of my duty to speak of this Act of Congress in its financial aspect, and yet there is an observation which I will make on that subject, because it bears somewhat on the constitutional question. By overthrowing the specie basis and flooding the country with a depreciated paper currency at a time when the government was the chief purchaser and consumer of the products of the country, it raised prices on itself, and unnecessarily augmented the public debt, which will be a burthen upon the future industry of the people. Did the people grant to their representatives the power to do this? They granted the power

[Shollenberger *v.* Brinton.]

to *furnish* a metallic currency, but in what part of the fundamental law did they grant the power *to take it away ?*

If it be true that war cannot be carried on without paper money, it is not true that war requires paper money to be made a legal tender. Our government has carried on several wars, foreign and domestic, and a commerce that has penetrated every part of the globe, upon a paper currency, State and Federal, having a sound specie basis, without making a dollar of that paper currency a legal tender. Where, then, is the ground for the assumption that this Act of Congress was demanded by the exigencies of our civil war ? Had Congress borrowed gold and silver enough at current rates to maintain the specie basis of our paper currency, I believe it could be demonstrated (though it is not my purpose to enter into the question) that the debt of the country to-day would have been less than half what it is, and that no one effort of the government would have lost energy or effect.

Not, however, to pursue these views further, I return to my position that none of the clauses of the Constitution that have been invoked sustain this legislation; for, however good the motives for the enactment, or however stern the apparent necessities for it, I can look upon it as nothing short of a violation of the faith of contracts ; and though one rose from the dead to testify against the fathers of the country, I could not be persuaded that they placed so pernicious a power in the Constitution. The proposition is too monstrous to be entertained. No men who ever lived understood better, or respected more religiously, the obligations of plighted faith ; and that they empowered the government, under pressure of any emergencies, to strike down, at one fell swoop, a third of the debts and credits of the country, is so incredible, that it ought not to be asserted until it can be proved. No evidence has been shown. No book of history, no judicial record five years old, no legislation before 1862, no tradition, no romance tells us that the Constitution was ever so read. And this is the reason why the professional mind was a unit on this point until a very recent period—the reason why the weighty words of Mr. Webster, which I placed at the head of this opinion, not only condensed the whole constitutional argument, but expressed the universal thought of the people. In the language of Fisher Ames upon the Jay treaty : " If there could be a resurrection from the foot of the gallows, if the victims of justice could live again, collect together and form a society, they would, however loath, soon find that it was their interest to make others respect, and they would therefore respect themselves, the obligations of good faith."

May I not assume and assert that the Constitution of the United States pays at least as much respect to the obligations of good faith as a community of felons would find themselves compelled to

[Shollenberger *v.* Brinton.]

do? Whilst much more than this might be justly claimed in behalf of the Constitution, nothing more need be conceded to condemn this Act of Congress. If the Constitution did not authorize that part of the enactment that relates to legal tender, it is null and void; and were the reasons for passing it a thousand fold stronger than they were, it were better to sacrifice the enactment to the Constitution than to repudiate the morality of the Constitution. " Good faith is the philosophy of politics, the religion of governments." It is worth more than many Acts of Congress, infinitely more than the one before us.

My judgment is, that so much of the Act as makes anything, except silver and gold, a legal tender in payment of debts, is unconstitutional and void.

But, it is said, the principal sum mentioned in these ground-rent deeds is not a debt within the meaning of the Act of Congress, because the ground-rent tenant, though entitled to pay it, is not obliged ever to do so. The annual or semi-annual interest upon that principal he is bound by his covenants to pay; and when we speak of this as a ground-rent, it is by common consent a debt. Our present question, however, has regard not to these periodical payments, but to the principal sum; and as to that, its technical classification is, undoubtedly, as a rent-service, which is an estate in land. But, though an estate, may it not also be a debt within the purview of the Act of Congress? I suppose that Congress used that word debt in its largest, most comprehensive, and popular sense, and that they meant by it every sum of money which one man was either obliged or entitled to pay, and which another had a legal right to receive.

An estate in land may also be a debt. Where land is bought and sold by articles of agreement, both vendor and vendee have an estate, and yet the unpaid purchase-money is a debt on the part of the vendee. True, there is a covenant that obliges him to pay, and in that point the analogy fails, but the point which the analogy illustrates is that purchase-money is a debt, whilst at the same time it is the measure of an estate. The principal of a ground-rent deed is nothing but purchase-money for land, and the covenants confer on the purchaser an option instead of an obligation to pay. When he exercises his option he has a legal right to pay, and the landlord is obliged to receive, and then, if never before, it becomes a debt. It may be likened to the right of a former owner to redeem his land, sold for taxes. That right is an estate or interest in the land; but the owner is not obliged to redeem; yet, when he exercises his option, the redemption-money is universally regarded as a debt. Since this Act of Congress, it has never been doubted that redemption-money could be paid in treasury notes. I think my Brother Agnew's opinion at Nisi Prius, in Shollenberger *v.* Brinton, followed, if not endorsed, by

[Shollenberger v. Brinton.]

my Brother Thompson in Davis v. Burton, has not been shaken by anything advanced in argument, and is not inconsistent with the point ruled in Bossler v. Kuhn, 8 W. & S. 183. The point ruled there was that a ground-rent becoming due after the discharge of the debtor, under the bankrupt law, was not extinguished by his certificate. When there was no covenant to pay, and no offer to exercise his option, it was necessary to say there was no debt within the bankrupt law; but that which distinguishes these cases from Bossler v. Kuhn is the very circumstance that gave rise to the cases, the *offer* of the tenants to pay. The covenants had given the option to pay principal or interest. So long as he elected to pay interest, that only was a debt; but on his election to pay principal, that became no less a debt.

A curious point has been taken—that, though debts, these ground-rents are not within the Act of Congress, because they stipulate for gold and silver. It is said Congress have not power to alter people's contracts when they stipulate for gold or silver, but have full power to do so if they only stipulate for lawful money. I cannot comprehend such reasoning. It is an extreme act of sovereignty to touch private contracts at all by legislation, but that the sovereign should be obliged to keep his hands off a contract that *expressed* the legal obligation, though at liberty to invade that which just as clearly *implied* the same legal obligation, is an incomprehensible distinction, especially in a case where the sovereign has expressed the only debts intended to be excepted.

But a full answer to the notion that a contract for gold and silver money is of a higher class than a contract for the lawful money of the country is found in the fact that when the law is called in to enforce such a contract, it gives a judgment for so much lawful money only, and permits that judgment to be paid in the same currency that is a legal tender in payment of all other debts.

Holding, therefore, that Congress meant by all debts everything in the nature of a contract for money, except what they excepted, I make no distinction in the cases before us, but treat them all as alike within the purview of the Act of Congress; but, inasmuch as I hold the act unconstitutional and void, I concur in reversing some and in affirming others of the judgments in the foregoing cases.

THOMPSON, J.—The question of the constitutionality of the legal-tender notes offered as an extinguishment of the principal of the ground-rent in this case was but little discussed in the argument, although involved in it, as the opinion of the chief justice, just read, abundantly shows; but as I think the case ought to be reversed on another ground, I withhold my opinion on that point, to be expressed in the case of Mervine v. Sailor et al., to be decided at this term. The only question, therefore, now is, was

the tender in notes of the United States of America, issued under the authority of the Act of Congress, passed February 25th 1862, commonly called "legal-tender notes," sufficient to extinguish the capital of the ground-rent reserved to the defendants?

The Act provides that said notes shall "be lawful money, and a legal tender in payment of all debts, public or private, within the United States, except duties on imports and interest (on the public debt) as aforesaid."

As these notes are not the universal currency and standard of value in the country, but born of the occasion which gave rise to them, and co-exist with another species of currency, namely, gold and silver, which furnish a universal standard of value, we are to give effect to them only as a substitute for the latter, in the cases and instances in which that effect is given by the statute. The above quotation shows that the Act makes them a legal tender in payment of debts, public or private, with the exceptions noticed.

The first question to be considered, therefore, is, whether the principal of the ground-rent is a debt, so that the legal-tender notes offered operated to extinguish it?

If we have recourse to the legal definition of the term "debt," they did not. Blackstone says, the legal acceptation of debt is a sum of money due by certain and express agreement: 3d vol. 154. It need not be demandable presently, but must be so at some time. *Debitum in presenti solvendum in futuro* may constitute, and does mostly constitute, what we call a debt. As is said in Broomfield *v.* Smith, 1 M. & W. 542, it is of the essence of a debt that it be demandable at some time; if it be not so, no claim can be maintained for it as a debt either in law or in equity. Of course there must be some party having the right to demand the discharge of it in accordance with the agreement creating it.

On the argument and at consultation, I was inclined to adopt the idea that at the moment of exercising the option to extinguish the rent by the owner of the fee, the sum to be paid *eo instanti* became a debt. This conclusion resulted rather from consequences supposed liable to flow from an opposite conclusion than from a logical view of the subject. I feared that redemptions of tax sales and the like, might be affected injuriously by such a conclusion; but on reflection I do not think they would, as tax sales and the allowance of a redemption is a mode of collecting taxes, and taxes are of the character of debts. They are properly debts created by law when overdue. But neither the law nor any contract renders it obligatory at any time, on the owner of the fee of land held on ground-rent, to extinguish the *corpus* of the rent; and while it remains unextinguished it is so far from being a debt, it is not even a chose in action of any sort, but an estate partaking of the nature of the realty from which it springs. It descends to the heir and not to executors or administrators.

[Shollenberger *v.* Brinton.]

It is an incorporeal hereditament, in which of course the owner has a fee, if the estate out of which it is reserved is a fee: 1 Barr 349; 3 Wright 42; 2 Harris 445.

The effect of the covenant to allow an extinguishment is simply an irrevocable proposition by the owner that his estate may be merged into the fee of the land by the performance of the conditions proposed. It is not, therefore, the payment of a debt; not alone because it is not demandable at any time, but in addition thereto, it is the acquisition of an estate which the law transmits as the consequence of the payment of a price; a different thing, altogether, from what we understand by paying a debt, even in the popular sense of the term.

But it is assumed that when the option is exercised to pay off the *corpus* of the rent, the relation of the parties as well as the amount to be paid is changed. This may be granted without prejudice to the principle here sought to be maintained. It must be remembered that the only mode of enforcing the option is by making the tender, and as the tender must take place and be perfect, in order to work the change it must be in such money as prior to the mutation would satisfy the covenant; otherwise we would embrace the sophism, that the principal being converted into a debt by the tender, the tender is made good by a conversion of the principal. The reasoning on this point, however plausibly advanced, amounts to scarcely more than this. At the best it requires the construction of an artificial theory to make the principal of a ground-rent a debt, and this I do not regard as demanded, in order either to give effect to the Act of Congress, which should be interpreted in the ordinary legal meaning of the terms used, or the relation created between the parties by the ground-rent deed. In fact, to hold as claimed by the appellee would be to violate, beyond dispute, the express terms on and by which he had the option to acquire the estate of the appellant in the ground-rent, unless indeed we should succeed in persuading ourselves that silver money is paper money, and paper money is silver.

I know of no better established rule than that laws in derogation of established rights are to be strictly construed. The construction contended for here is the very opposite of this principle. If a universal rule had been adopted by Congress in regard to the effect and operation of the issue of legal-tender notes, so as to supersede all other *media* of currency, there would have arisen a rule of necessity out of such a revolution as would have required the courts to give the same effect to the substituted money as belonged to the displaced; but that is not the case. These notes are by express words restrained of their universality as a legal tender. And this makes it obvious that the intention of Congress was that they were to be legal tenders only within the legal

boundaries defined by the terms used, viz.: in payment of debts. It must have been the object of the Act to afford the means of payment in paper instead of coin to those who could be compelled to pay their debts. Those who were not so situated needed no law of relief or convenience. The owners of real estate on ground-rents could not be compelled to pay anything but the annual rent as it accrued, and as this became a debt when due, the law applied to that because the tenant could be compelled to pay it; but is there not. an infinite difference between that and the principal sum, which, although existing, could not be demanded ?

I·derive support to my conclusion that the principal of the ground-rent in this ·case is not a debt, from two decisions recently made in this city, viz.: Philadelphia and Reading Railroad Company *v.* Morrison, in the Circuit Court of the United States, opinion by Grier, J.; and Patterson's Petition, in the Common Pleas, opinion by Allison, J.; both reported in the Legal Intelligencer of November 18th 1864. In support of this view I also rely on Bossler *v.* Kuhn, 8 W. & S. 186. In the opinion delivered by Gibson, C. J., it is said " a rent-service is not a debt." In Sergeant *v.* Ingersoll, 1 Wh. 337, ground-rents were held to be rent-service, and a covenant to pay it is not a covenant to pay a debt; it is a security for the performance of a collateral act. The annual payments spring into existence, and for the first time become debts when they are demandable, for while they are growing due the landlord' has no property in anything distinct from the *corpus* of the rent or the realty of which they are the produce, and the fruit must be severed from the tree which bears it before it can become personal property and a chose in action. I close this part of my opinion by a reference to a practical test or two.

By the Act of 1844 debts due and owing by solvent debtors were made taxable for state and county purposes. It is certain that this was not supposed to cover the *corpus* of a ground-rent, for that is required to be valued and taxed to the owner not as a debt due, but in its character as property. Nor do I suppose any insolvent debtor ever returned his ground landlord as a creditor to the extent of the principal of the rent. Indeed, the idea that it is a debt is of recent origin, and is supported neither by authority nor just analogy.

If these views be correct, it follows that the principal of the ground-rent in question was extinguishable only on the terms of the covenant, namely, by a tender in payment of lawful silver money. While I agree with what is sometimes asserted in these cases, that whatever is lawful money of the kind stipulated to be received at the time of exercising the option to pay, will be a good tender notwithstanding the sovereign power may have changed its value; undoubtedly the rightful exercise of power

[Shollenberger v. Brinton.]

in a State is not to be controlled by the mere terms of contracts. For example, our coin was reduced in its standard of fineness in 1837, and no court ever held that it was not a legal tender in payment of debts and engagements entered into when it was intrinsically more valuable. The case of the Mixed Money, to be found in Sir John Davies's Irish Reports 48, is in point to this effect. But, notwithstanding this, if a purchaser of ground takes it on special terms and conditions as to the redemption of the annual duty by paying the principal out of which it accrues, I see no hardship in holding him to the terms, if they be legally possible, and I do not believe there is an instance on record in which a decree for specific performance in the absence of fraud ever was made without performance by the party seeking to have performance, unless he was prevented by the party, the law, or the act of God. Impossible conditions, especially subsequent, never defeat a contract; but " the rule does not extend to contracts founded on difficult, impossible, or contingent considerations, for it is the duty of the promissor well to weigh the difficulty or impracticability of the consideration before he binds himself to perform it; and the law will not help him to avoid duties which he has deliberately imposed upon himself so long as they are possible." Story on Cont. 463, and note. The original grantor of the land in this case, and his grantor of the ground-rent, established the law of the case as it was to be between them and their assignees, and in the absence of any intent on the part of Congress to break down such contracts to give greater scope to the paper currency created by it, supposing the right to impose them be conceded, we have no right to abate a tittle of what the parties agreed should have the effect of performance, the possibility to perform remaining unimpaired. For these reasons and another, which I think exists, noticed in the outset as waived, I am for reversing this case.